224 F.2d 591
 LADY NELSON, LTD. and Canadian National (West Indies) Steamships, Ltd., Libelants-Appellees,
v.
CREOLE PETROLEUM CORPORATION and The BARGE 75-8, Claimant-Respondent-Appellant.
CREOLE PETROLEUM CORPORATION, Cross-Libelant-Appellant,
v.
LADY NELSON, LTD. and Canadian National (West Indies) Steamships, Ltd., Cross-Respondents-Appellees.
 No. 299.
 Docket 23223.
 United States Court of Appeals Second Circuit.
 Argued April 13, 1955.
 Decided July 5, 1955.
 
 Raymond T. Greene, New York City (Kirlin, Campbell & Keating, Ira A. Campbell and Stephen J. Buckley, New York City, on the brief), for appellants.
 Eugene Underwood, New York City (Burlingham, Hupper & Kennedy and H. Barton Williams, New York City, on the brief), for appellees.
 Before CLARK, Chief Judge, and FRANK and HASTIE, Circuit Judges.
 HASTIE, Circuit Judge.
 
 
 1
 A libel and cross libel have resulted in decrees determining fault and liability for ships' damage in a collision at sea. The appellants are one of the colliding vessels, Barge 75-8, and its owner Creole Petroleum Company. The appellees and original libelants are the owners and operators of the steamship Lady Nelson, the other colliding vessel.
 
 
 2
 On this appeal the first question is whether the evidence justified the trial court's finding that due care was exercised in the navigation of the Lady Nelson. These are the relevant facts. The collision occurred on a dark but clear and calm night in the Gulf of Paria between the Island of Trinidad and the Venezuelan mainland. Barge 75-8, some 150 feet in length, fully loaded and low lying, was being towed by a small fifty-foot tug from a Venezuelan port to Port of Spain, Trinidad. The barge was unlighted. The tug showed one white masthead light. The evidence justified a finding that the required second white light, which would have indicated a vessel with a tow, was either absent or so located or obscured as not to be observable by an approaching vessel. It is clear that both the tug and the barge were negligent in their failure to show proper lights.
 
 
 3
 On the other hand the trial court found no fault in the navigation of the Lady Nelson. She was a four hundred foot passenger and cargo steamer outbound from Trinidad to Montreal. Some thirty minutes after dropping her pilot out of Port of Spain, she had just completed a maneuver to achieve the course upon which she proposed to traverse the Gulf of Paria. Steadying on that course and heading toward open sea at her normal cruising speed of about thirteen knots she saw a single light of another vessel ahead. At that time the captain and the mate were on the bridge. In their estimation the observed light was about two and one-half miles distant. Another witness for the Lady Nelson was a passenger named Goss who was forward on deck at all relevant times. Goss, a man with considerable nautical experience, said that he first saw the light in question at a distance of about four miles. Both the mate and Goss placed the light dead ahead. The master located it as bearing four degrees, less than half a point, on the port bow. Equally important, the mate, immediately after sighting the light ahead, made an observation with glasses and in that way was able to see both red and green side lights of the vessel ahead. Thereafter the Lady Nelson continued on course all the while observing ahead red and green side lights of another vessel approaching on such course as unmistakably to indicate an end on meeting. Goss indicated that this opposition of courses with both red and green lights visible continued until the vessels were only about three-fourths of a mile apart. He expressed his reaction to this situation by saying, "I was surprised to note how she still held directly on her course, which laid her directly into the course of the Lady Nelson". During all of this time, because of darkness, no outline of any object ahead could be seen. The testimony of the mate also shows that the Lady Nelson had a half mile of safe water to starboard. However, the only reaction of her master to the developing situation was to order "nothing to port".
 
 
 4
 At this point, without regard to subsequent events, it is clear that the Lady Nelson already had committed serious fault. It is not disputed that the International Rules were applicable here. Article 18 provides that "When two steam vessels are meeting end on, or nearly end on, so as to involve risk of collision, each shall alter her course to starboard, so that each may pass on the port side of the other." 33 U.S.C.A. § 103. In addition, this Article explains that at night the visibility of both side lights of an approaching vessel indicates an end on meeting. And since "it is the risk of collision, not the collision itself, that masters must avoid," Ocean S. S. Co. of Savannah v. United States, 2 Cir., 1930, 38 F.2d 782, 784, the only debatable question as to fault here is whether "risk of collision" had developed as the vessels continued toward an end on meeting. In some circumstances the existence of such situation may be a doubtful question as to which reasonable appraisals may differ. In this case, however, we think it too clear for dispute that the Lady Nelson steered directly and knowingly to a risk of collision situation. In darkness, unable to see the outline of the approaching vessel, she persisted at undiminished cruising speed on a head on meeting course for some two miles until only about ten lengths separated the vessels. Her speed alone would have brought the vessels into collision within another two minutes. And she had no way of determining how much the speed of the other vessel would further shorten this interval within which maneuvering was possible. The risks inherent in the characteristic first response of a large moving ship to a sudden putting over of the helm are too familiar to require elaboration.
 
 
 5
 The plain fact is that the Lady Nelson insisted on maintaining her own course, trying to impose upon the other vessel alone the responsibility the law imposes on both to change course to starboard soon enough to avoid risk of collision. See The America, 1875, 92 U.S. 432, 433, 23 L.Ed. 724. On the facts, therefore, we deem it a necessary finding that the Lady Nelson committed a serious fault of navigation by proceeding into risk of collision in disregard of her duty to change course and give way to starboard.
 
 
 6
 This brings us to a more difficult question. Lady Nelson did not collide with the tug of whose presence she was warned, but rather with its unlighted tow. The evidence shows that when the meeting ships were three-quarters of a mile apart the Lady Nelson observed the shutting out of the approaching vessel's green side light, an indication that she was making an appropriate change of heading toward safety, albeit a tardy one. In the meantime the Lady Nelson continued on her course leaving it to the other vessel to move far enough and fast enough to prevent mishap. Actually, when the two vessels came abeam, something less than a ship's length of open water separated them. Then for the first time, and too late for successful emergency maneuvering, it was observed from the bridge of the Lady Nelson that the tug was towing a barge. A few seconds later the Lady Nelson collided with the tow causing the damage to both colliding vessels which is the subject of this litigation.
 
 
 7
 In these circumstances it is necessary to consider whether the Lady Nelson was negligent in relation to the risk of such an accident as that which occurred. The controlling principle is a familiar one, clearly stated in a recent formulation by Professor Seavey: "If the reason why the defendant's act was negligent was that an injurious result might happen in a particular way or to a particular thing, he may not be liable if the event happens by different means or to a different subject matter." Seavey, Cogitations on Torts, 1954, 32. Cf. Palsgraf v. Long Island Ry. Co., 1928, 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253. This principle has been applied to maritime torts. The Eugene F. Moran, 1909, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600; Diamond State Telephone Co. v. Atlantic Refining Co., 3 Cir., 1953, 205 F.2d 402.
 
 
 8
 It is arguable, therefore, that the failure of the Lady Nelson to alter her course was negligent only in relation to the danger of collision with the tug itself; hence, in legal contemplation, she was not at fault in the collision with the tow. However, we think that argument views too narrowly the risks which give rise to the navigator's duty to give an approaching ship a wide berth, circumstances permitting. "The duty to keep out of the way * * * embraces the duty to keep away by a prudent and safe margin, having reference to all the contingencies of navigation * * *." The Aurania and the Republic, D.C.S.D.N.Y. 1886, 29 F. 98, 125. Such contingencies are numerous and varied. For examples, see The Majestic, 2 Cir., 1891, 48 F. 730; The Laura V. Rose, D.C.S.D.N.Y.1886, 28 F. 104. At night they include uncertainty as to what may be ahead as well as how it will maneuver. More particularly, it is not so uncommon an experience as to be disregarded that the light of an invisible vessel ahead may indicate a hazard somewhat different from or greater than that disclosed by a mere reading of the light's conventional message. We regard this as one of the reasons for such giving way in a meeting situation as is required of both vessels by Article 18 of the International Rules. Therefore, if this risk eventuates in an accident which would have been avoided by compliance with the meeting rule, the occurrence is comprehended by the breach of duty. Cf. Robinson v. Detroit & C. Steam Nav. Co., 6 Cir., 1896, 73 F. 883.
 
 
 9
 This analysis imposes no new obligation and no unreasonable responsibility upon commerce. The duty of the navigator continues to be no more than normal compliance with the meeting rule. And liability for injury resulting from violation of that rule is imposed only for damage to a disclosed source of danger and things closely associated with it. Tug and tow, as involved in this case, are perhaps the most obvious example of such association. Cf. Robinson v. Detroit & C. Steam Nav. Co., supra, 73 F. at 891. Indeed, so intimate is their relationship that for some purposes they are treated as a single legal unit. See Griffin, Collision, 1949, 411. Thus, responsibility is so limited with respect to both subject matter and physical area that owners and operators of ships are not subjected to any unfairly extensive or burdensome liability. And certainly there is nothing of commercial or other social consequence to be gained by excusing a navigator's disregard of the unqualified mandate of the meeting rule whenever it appears that compliance by the other ship alone will suffice to avoid the obvious danger. Compare the analysis in Judge Frank's dissenting opinion in Hentschel v. Baby Bathinette Corp., 2 Cir., 1954, 215 F.2d 102, 105, 112.
 
 
 10
 Two other issues deserve mention. The appellants question the jurisdiction of the District Court over the barge in rem. But a stipulation for costs was filed on behalf of the barge and it was agreed that the answer of the owner in personam should also serve as answer in the proceeding in rem. In these circumstances, we think the court was empowered to adjudicate the liability of the barge in rem.
 
 
 11
 Creole Petroleum Corporation also complains of a finding that under the applicable law of Trinidad it bore a non-delegable responsibility for the proper lighting of its barge during towage. This finding of a rule of foreign law was based upon adequate proof and is entitled to stand.
 
 
 12
 It follows that damages must be divided. The decrees will be reversed and the cause remanded to the district court for further proceedings consistent with this opinion.
 
 
 13
 CLARK, Chief Judge (dissenting).
 
 
 14
 The findings of the district court showing that "[t]he officers and crew of the Lady Nelson were not negligent in any particular but on the contrary acted with the care and skill required of prudent navigators" seem to me strongly buttressed in the evidence. Upsetting them is contrary to the regard for admiralty findings expressed in McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6; additionally this course must rest on certain premises as to navigation which will surely both confuse and burden our merchant marine.
 
 
 15
 Since the tug's one light denied the presence of a tow, and the towed barge was unlighted, no negligence can be attributed to the Lady Nelson for failing to see the barge in time to avoid the accident. Responsibility must therefore be predicated upon some unfulfilled duty owed the tug and in some manner transferred to the tow. Respondent's counsel have been rather successful in building up an atmosphere of a big vessel running down a little one and forcing the latter to give way on pain of being hit. But I am quite clear that on the facts as they existed and were found, the claim is specious and unfounded.
 
 
 16
 Before I turn to the fact findings let me try to put this issue of "close-shaving" in its proper perspective as it came before the trial court. Respondent had some six or seven claims ranging from the jurisdiction of the court in admiralty to certain issues of fact. Most stressed of these issues was the alleged failure of the Lady Nelson's lookout to report the barge; nearly as much was made of her claimed failure to make proper use of her radar equipment. The trial court properly found against respondent on them, and they are not adverted to in the opinion. The claim of close shaving was actually based upon the deposition of the tug's master, Fuentes, that the Lady Nelson "changed her course" to pass on the port side very close to his vessel. But this contention of change of course was discredited in the evidence and not accepted by the trial court, which found that the Lady Nelson "continued on without change of course." It also found that the vessels passed "port to port, without incident or difficulty, at a distance of about one shiplength" or over 400 feet. The trouble came thereafter from the unlighted low-lying barge in the wake of the tug.
 
 
 17
 In view of these well supported findings it would seem doubtful that the Lady Nelson could properly be held liable even if we accept the picture of inconsiderate navigation limned in the opinion. For she has completely fulfilled her obligation of 33 U.S.C. § 103 of navigating with respect to an approaching vessel "so that each may pass on the port side of the other." But in truth this picture was not the one before the trial court, as was shown by the straightforward testimony of her master and mate, supported by the deposition of the disinterested witness Goss. After the Lady Nelson steadied on her course for the open sea, her master and mate first saw the tug's single white light. This told little, since indeed it might have been the stern of a vessel. But close observation discovered the other lights of the tug and enabled the master to deduce correctly that approaching was a small steam vessel. There surely was then no occasion for him to swerve off his course for fear of some misnavigation on the part of the approaching vessel. What he did was quite properly to order the quartermaster "not to allow anything to the port of the course" or "in other words, not to allow the ship to fall off to the left of her course." (This is the direct testimony of Vaughan, the mate.) So she was held carefully to her course and so passed port to port safely and without incident as we have seen. What more should she have done? The holding otherwise seems somewhat as though a large car approaching a small Ford on a broad highway must climb the greensward to its right for fear there may be an unlighted trailer to the Ford which may get in its path.
 
 
 18
 Some point is made that the tug when three-quarters of a mile away made a change of heading to starboard and toward safety while the Lady Nelson continued on her course, leaving it to the other vessel to move out of danger. This seems to me an unjustified deduction; yielding of the course by the tug would seem an appropriate, though unduly belated, action to get its unlighted tow out of the way of trouble if possible. It knew of the danger as the other vessel did not. Thus there is nothing to show that the Lady Nelson's course was not circumspect and appropriate, as her successful passing of the tug demonstrates. Point is also made of her speed; but this, too, seems appropriate for a passenger vessel in the open sea. The desirability of maintaining schedules is, or should be, obvious in this age of competition for passenger carriage.
 
 
 19
 The safe navigation of ships, particularly at night, must depend on the trust-worthiness of signals, known to mariners and set by law. Any holding which weakens their validity or indeed falsifies their message is disturbing. It lends some support to the careless, and it puts a duty of undefined character upon the vigilant to read something more than the signals themselves say. Here, further, two vessels, tug and tow, combined to falsify the message; yet they only share jointly and together the burden of liability which is placed equally on the vessel which has had the misfortune to rely on what they were saying. I think affirmance here is desirable for the good of our merchant marine.