GRANADAISA FOODS, Inc. (Formerly named M. J. & J. H. Meyers & Company, Inc.), Libellant,

v.

COMPANIA DE NAVEGACAO CARREG-ADORES ACOREANOS, Respondent.

No. 19323.

United States District Court
E. D. New York.

April 3, 1956.

Bigham, Englar, Jones & Houston, New York City, for libellant, by Lawrence R. Thomsen, New York City, advocate.

McNutt & Nash, New York City, for respondent, by Donald B. Allen, New York City, advocate.

BYERS, District Judge.

This is a cargo damage case involving 5,759 wooden cases containing sardines in cans carried on respondent's ship Pero de Alenquer to be called Pero, from Portimao, Portugal, to New York. The date of departure was December 24, 1948, and of arrival, was January 17, 1949.

There was a conceded shortage of two cases, and respondent consents to a decree for libelant in the sum of $125 and costs to October 14, 1955.

The question for decision is whether the proof shows that the carrier is to be held liable by reason of the condition of roughly two-thirds of the cases and the tins of sardines therein contained, at discharge.

The bills of lading recited apparent good order and condition; on arrival it was found that approximately 3,871 cases were water-stained, and 1,886 were not stained to any observable degree. The former number were divided into two groups, of which 407 were wet-stained (moist to the touch) and 3,464 were less obviously water-stained, namely to an extent that might be overlooked by a casual observer, as to a portion of them.

When the cases were opened and the contents examined, it was found that a considerable number of the cans were so seriously rusted as to render them unmarketable in that condition.

It was agreed that fresh water caused the damage.

The libelant relies upon the unconditional character of the bills of lading, and urges that the respondent has not met the former's prima facie case. The respondent's contention is that within the purview of Section 4(2) of the Carriage of Goods by Sea Act, Tit. 46 U.S. C.A. § 1304, subd. (2), clauses (i)—act or omission of shipper—(m)—inherent defect—and (q)—any other cause not fault of carrier, the evidence must result in a decree in its favor, except as previously stated.

The controversy turns upon whether the conditions so discovered on discharge are shown to have resulted from a breach of the carrier's obligations, or to the presence of moisture within the wooden cases when they were laden, although that condition, if then existing, had not caused any discoloration on the cases themselves.

All of the cargo here involved was laden at Portimao, on December 24, 1948, as to which eight clean bills of lading were issued on that day:

| No. | 5 | 307 cases |
| | 6 | 111 " |
| | 7 | 145 " |
| | 8 | 98 " |
| | 22 | 736 " |
| | 23 | 242 " |
| | 24 | 254 " |
| | 25 | 3,866 " |

The cases were not of uniform content as to the number of tins.

## Stowage.

The cargo plan does not identify these cases completely, but it shows that 6,036 cases of canned goods were stowed in lower No. 2 and 6,145 in lower No. 3. The manifest indicates that 12,181 cases of canned goods were laden at Portimao and that 5,759 of them were the property of Alianca Exportadora, the libelant's purchasing agent.

Thus it is clear that the cargo in controversy was laden partly in hold No. 2 forward of 322 drums of ore and beneath bundles of wicker goods and a case of embroidery; and in hold No. 3 forward of 987 bundles of corkwood, and directly beneath cases of wine, which in turn were under about 1,000 cases of canned goods.

## The Voyage.

Departure was had from Portimao as stated, and the other ports of call in order were: Leixoes (Portugal), Funchal (Madeira) and Ponta Delgada (Azores). The weather was good to Funchal, bad, fair and good to Ponta Delgada; and from the latter to New York there were but two days of bad weather.

Thus the recitals in the log which is in evidence; the libelant points to no entry which would indicate that weather conditions encountered on the voyage were such that fresh water staining or wetting of the wooden cases could be attributed thereto.

## The Condition of the Lower Holds 2 and 3.

This subject was not alluded to in libelant's case. For the respondent the relevant testimony as to loading is that of Gomes, the ship's master, and Branco, the chief officer, both by deposition.

The former said the condition of the holds at loading was excellent. That was an expectable answer to the interrogatory but cannot be dismissed solely for that reason. Being asked to describe the ventilating conditions, he said:

"The ventilators, two of which are installed in each hold. The ventilating system is always the object of our most careful attention; when the weather is good, the ventilators are kept open but when the weather is bad, they are kept close. (Sic.)

"Q. Did water enter the holds at any time? A. No, that is impossible."

He had explained that the holds were closed with hatch covers and three or four tarpaulins.

Branco's deposition is the more informing as to the conditions of the holds when cargo was taken; as was his duty, he said that he had inspected them before the loading, and during that process they were clean and dry.

No reason is urged by libelant for discrediting this testimony, nor does one suggest itself to the court.

Branco observed the discharge on arrival here and states that when the cargo hatches were opened he observed no evidence of water or moisture in these holds and that they were dry.

That testimony was corroborated by the cargo surveyor Pilcher who conducted a general agent's survey on behalf of Flomarcy Line (the then general agent for respondent) on January 18, 19, 20 and 21, 1949.

He examined the holds after discharge was completed and he found: "With the exception of No. 1 shelter deck where there was heavy sweating, the compartments were dry and clean, and I saw no evidence of water having entered during the voyage, or of any condensation or sweat." This was true specifically of Nos. 2 and 3 lower holds.

He noted moreover dry cement dust—siftings from cement in bags which had been carried above this cargo; he said: "* * * Those siftings were lying over cases of fish which were then about seven feet below the 'tween deck level. The cement siftings were dry and free. Had there been moisture they naturally would have been caked." Later he said this remark referred to lower hold No. 3 and that he was told that the cement had been discharged at Ponta Delgada, Azores.

There was no attempt to controvert the testimony concerning the condition of the holds in which this cargo was stowed.

If the ship has failed to adduce testimony to the effect that it adequately performed its duty as carrier from the time the cargo was received until discharge was completed, the court has failed to discover it; moreover the libelant's briefs do not discuss any such deficiency beyond suggesting somewhat casually, that the testimony of the master and the chief officer is not positive "that the cargo could not have been damaged while on board the vessel." If they had attempted any more elaborate assertions than appear in their depositions, an interest in the outcome of litigation might have been suspected, rather than a purpose merely to indicate an alertness to the duties of a deck officer on a cargo ship.

The respondent has thus presented credible evidence of proper stowage in dry clean holds, proper and adequate ventilation and customary precautions to protect the cargo while being carried, and the absence of the entry of fresh water into either of these holds throughout the voyage. None of that evidence has been refuted in any degree.

The libelant contends that in view of the clean bills of lading, the respondent must assume the burden of proof as to the cause of the damage as revealed on discharge; this seems to mean that in addition to proving that it has fairly performed its obligations as carrier, it must demonstrate either, (a) that the bills of lading should have contained potential or contingent exceptions although no reason was apparent at the time the cases were laden to suspect that a wet and stained condition as to most of them would eventually appear; or (b) that it is estopped to assert that since no act or omission on its part caused the damage, the libelant has not demonstrated a breach of the contract of carriage. These arguments seem to misconceive the true relation of the parties.

The contract of carriage implies no assumption of responsibility for the actual constituency of the subject-matter, but only what its outward appearance indicates.

Since these cases appeared to be in good condition, the bills of lading so described them. The evidence demon-

strates a change in that appearance at discharge: also that it was not caused by any act or omission of the carrier, while the cases were in its custody. Beyond that the respondent, in reason, cannot be required to go.

Whether the cases had been exposed to exterior wetting and had dried out, or the cans within them were wet or damp when packed, are both matters about which the carrier could not know, but which the shipper should know or be able to ascertain.

In this connection libelant's Exhibit 6 is not without interest. This is a letter of advice by its purchasing agent, dated December 29, 1948, enclosing invoices covering this shipment, and closes as follows:

"We sincerely hope that the goods arrive in good condition and according to your request *we succeeded to get clean* 'on board' bills of lading" (italics supplied).

Respondent calls attention to the language of the libel in Article Third in that the carefully chosen allegation is that the bills of lading acknowledged receipt of the shipment "in apparent good order and condition"—not that the cargo was so in fact.

This circumspection in pleading may not be wholly unrelated to the achievement proclaimed in the letter of advice.

It is to be remembered that subd. (q) of the statute relieves the carrier of responsibility for "Any other cause arising without the actual fault and privity of the carrier * * * but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier * * * contributed to the loss or damage."

This burden of proof the carrier has sustained, and it is so found.

This finding is consistent with the provisions of the Act touching the prima facie evidence ascribed to the bills of lading, Tit. 46, § 1303(4), and the necessity under which the carrier rested to adequately demonstrate the manner of performance of its contractual duty. That necessity did not extend to explaining the actual causes of the rusting of the tins so long as no outward appearance of wetting and staining was present when the bills of lading were issued. The Niel Maersk, 2 Cir., 91 F.2d 932; Pettinos, Inc., v. American Export, etc., D.C., 68 F.Supp. 759; McNeely & Price Co. v. The Exchequer, D.C., 100 F.Supp. 343; McNeely & Price Co. v. The Lambrook, D.C., 100 F.Supp. 345.

The case of Kupfermann v. United States, 2 Cir., 227 F.2d 348, has been examined as has the opinion of the District Court, Karabagui v. The Shickshinny, 123 F.Supp. 99, and nothing has been discovered therein which teaches a different burden of proof upon this respondent than has been stated above.

The argument of libelant for estoppel is misconceived. The Carso, 2 Cir., 53 F.2d 374, dealt with many bills of lading, some of which were held to have improperly recited good order and condition; and the carrier was held to be estopped to show the true facts which were in part to the contrary. Here there is no such showing. Even if the cases involved were in fact damp and wet as to interior condition, there is no evidence from which it can be inferred that their outward appearance was other than as these bills of lading set forth. That is to say, this carrier is not shown to have attested to an untrue state of affairs whereby the libelant or the bank which issued its letter of credit, changed its position.

If the libelant's argument means that the respondent may not now be heard to urge that since these cases suffered no damage while its responsibility for their proper carriage existed, it must be apparent that their true inner condition antedated that period of time, the contention is unsound. It seems clear to this court that the suggestion of the respondent may be advanced, and considered plausible, without the court's imposing upon it the requirement of proof. In other words, it is an argument, and noth-

ing more, so long as the carrier has demonstrated its own fidelity to the duty which it assumed when the cargo was laden. Incidentally, the fact that many outwardly undamaged cases contained rusted cans, gives point to the argument.

It is concluded therefore that the respondent has met the burden of proof resting upon it under the applicable statute, and that it is entitled to a decree dismissing the libel, except as stated, to be settled on notice.

No other costs to either party.

If further findings are desired, they may be settled with the decree.