**HECHT, LEVIS & KAHN, Inc.,**
Libellant-Appellant,

v.

**THE S. S. PRESIDENT BUCHANAN, HER ENGINES, ETC.,**

and

**American President Lines, Ltd.,**
Respondent-Appellee.

**No. 359, Docket 24028.**

United States Court of Appeals
Second Circuit.

Argued May 18, 1956.

Decided Aug. 27, 1956.

Hill, Rivkins, Middleton, Louis & Warburton, New York City (J. Edwin Carey,

New York City, of counsel, on the brief), for libellant-appellant.

Dow & Symmers, New York City (William G. Symmers, Frederick Fish and William Warner, New York City, of counsel, on the brief), for respondent-appellee.

Before MEDINA, LUMBARD and WATERMAN, Circuit Judges.

LUMBARD, Circuit Judge.

The purchaser of crude rubber in transit by ship from Singapore to New York has sued the respondent carrier for damage to the rubber, allegedly caused by improper stowage. Judge Walsh, in an opinion delivered orally at the close of the evidence, found for the carrier, except for the minor item of oil damage. The question raised by this appeal is whether Judge Walsh committed error in finding that the damage resulted from the inherent vice of the cargo rather than improper stowage of the carrier.

The S. S. President Buchanan is a cargo ship of the "Victory Ship" class, owned by the appellee, American President Lines, Ltd., and operated by it as a common carrier for hire between the ports of Singapore and New York, among others. On May 15, 1951, the appellee received on board at Singapore the consignment in question. It consisted of 500 bales of flat bark rubber apparently in good condition. A bill of lading to that effect was given to the shipper. The bill of lading specified the total weight of the shipment as 112,000 pounds, "gross and net."

Flat bark rubber is one of the lowest and softest grades of commercial rubber. This shipment consisted of "bareback" bales which means that they had no wrapping, but were merely banded with three steel bands to a bale.

210 bales of the shipment were stowed in three or four tiers in the upper one-fourth of the number 4 forward starboard deep tank on top of some 1,069 other bales of rubber. This deep tank is located immediately aft of the engine room, being separated from it by an unsheathed steel bulkhead. The other bulkheads of the deep tank are formed by the shaft tunnel to port, the number 4 after starboard deep tank to aft, and the skin of the vessel to starboard. Below the deep tank are the double bottom fuel oil tanks and above it is the number 4 lower hold. Two small gooseneck pipes, each having an inside diameter of 2¾ inches, extend from the deep tank to the weather deck; the primary purpose of these is apparently to provide for the overflow of liquid cargo. On this trip the cover of the deep tank was raised by four-by-four beams placed across the top of the tanks in order to provide additional ventilation.

The remaining 290 bales of the shipment were stored in the number 5 lower hold on top of a cargo of hemp, separated from the hemp by a canvas tarpaulin. The number 5 lower hold was equipped with ventilators fore and aft.

On June 12, 1951, while the shipment was at sea, the libelant-appellant purchased it, cash against documents, from the original consignee. One of the documents included in the transfer was a clean on board bill of lading. When the President Buchanan docked at New York on July 15th, however, much of the rubber was unloaded in a massed and fused state. The shipment was in such poor condition that part of it could not be discharged bale by bale but had to be cut into pieces and lifted out in chunks. 230 whole bales were delivered along with chunks and pieces which weighed 54,955 pounds. Apparently included among the chunks and pieces requiring reconditioning were 59 additional whole bales which were damaged by oil. A test weighing of 50 of the 230 bales indicated that the total weight of the 230 bales was 50,830 pounds. Thus the total weight of the rubber delivered was approximately 105,785 pounds. The libelant sought to prove that the damage to the rubber flowed from the shipowner's negligence in stowing the cargo. It contended that the number 4 deep tank, because of its proximity to the boilers and because of an alleged lack of proper

ventilation, should not have been used for the carriage of rubber. On the other hand the respondent contended that these damages to the cargo were caused by an inherent vice in the rubber.

In the opinion which he dictated at the close of the case and in his additional opinion denying a motion for reconsideration Judge Walsh found that the cause of the deterioration of the rubber was its inherent vice. He relied largely on evidence that flat bark rubber has a tendency to deteriorate, especially if it is improperly dried or more than six months old, and on expert testimony that the stowage in number 4 deep tank was proper stowage. In support of its contention that stowage in the deep tank had caused the damage, the libelant argued that the rubber which had been carried in the number 5 hold was relatively undamaged and that all of the rubber in the number 4 deep tank was damaged, including shipments which did not belong to the libelant. Judge Walsh found, however, that these contentions were not supported by the evidence.

With respect to oil damage Judge Walsh found for the libelant and referred the matter to a commissioner for determination of the amount of damage. From this portion of the decree there has been no appeal.

The libelant argues on this appeal that Judge Walsh's findings are clearly erroneous and further that he improperly placed on the libelant the burden of proving that the damage to the rubber was not the result of inherent vice. Libelant also objects to Judge Walsh's dictating his opinion and failing to make separate findings of fact and conclusions of law.

■ Judge Walsh's memoranda sufficiently indicate the factual and legal bases for his conclusion. Failure to make separately itemized findings and conclusions is not reversible error under Admiralty Rule 46½, 28 U.S.C.A. so long as the opinion of the trial judge clearly states the findings and conclusions upon which the judgment is based. United States v. Ladd, 4 Cir., 1952, 193 F.2d 929, 930; Koehler v. United States, 7 Cir., 1951, 187 F.2d 933, 938; cf. Kelley v. Everglades Drainage District, 1943, 319 U.S. 415, 422, 63 S.Ct. 1141, 87 L. Ed. 1485. In a case such as this where the issues are relatively simple we believe that the immediate dictation of an opinion by the judge while the evidence and issues are fresh in mind is a salutary practice which saves time and further expense. See also Polarus Steamship Co., Inc., v. The T/S Sandefjord, 2 Cir., 236 F.2d 270.

We are of the opinion that Judge Walsh's findings are not clearly erroneous. There was conflicting evidence on the questions whether some of the damaged rubber came from the number 5 hold and whether all the rubber in the deep tank was damaged. Thus Albert Domergue, the Captain of the President Buchanan, testified that some of the fused rubber came from the number 5 hold and that the rubber under the libelant's in the number 4 deep tank came out all right. Carl E. Megquier, the pier superintendent who supervised the unloading of this shipment, testified that the rubber in the number 5 hold, as well as that in the deep tank, was "badly stuck" and "severely fused." He also testified that the rubber which had been stowed underneath libelant's in the number 4 deep tank came out fairly well and that no consignee other than the libelant took exception to the condition of its shipment. All of this testimony tended to support the conclusion that it was some characteristic of the libelant's rubber, rather than the place of stowage, which caused the deterioration.

Respondent produced evidence that flat bark rubber has a natural tendency to deteriorate with age. Walter Lang testified that after six months flat bark rubber starts to deteriorate badly and that it tends to fuse into a mass. He also testified that deterioration results from a failure to dry the rubber properly and that "discoloration" is evidence of improper drying. The weight certificate prepared for the libelant when the rubber was unloaded contained a notation

**630**

that there was "discoloration" in the shipment. The libelant presented no evidence to show the age of the rubber when it was shipped or to show that it was properly processed and in sound condition.

The libelant contended that the damage to the rubber resulted from excessive heat and insufficient ventilation in the number 4 deep tank. The respondent, however, produced expert testimony to show that the boilers were some distance away from the bulkhead between the engine room and the number 4 deep tank and that the temperature of that bulkhead and of the interior of the deep tank did not exceed 95 or 96 degrees. Lang testified that there would be no more than the normal deterioration at a temperature of 100 degrees.

▆ Finally the respondent called in its behalf Captain Merle W. Allen, a qualified expert who had made extensive tests and studies relating to the shipment of rubber in ships like the President Buchanan. Captain Allen testified that the heat was not excessive, that the ventilation was sufficient, and that stowage in the number 4 deep tank was proper for flat bark rubber without inherent vice. The libelant presented contrary expert testimony, but Judge Walsh was not bound to accept it. Even the cold record indicates that the testimony of Captain Allen was far more impressive than the evidence offered by the libelant. We think the evidence plainly sufficient to support Judge Walsh's conclusion that the damage to the rubber resulted from its inherent vice and not from any improper stowage.

▆ The libelant contends, however, that it was erroneous for Judge Walsh to deny it recovery for 6,215 pounds of rubber which it alleges were not delivered. This argument is based on the fact that, according to the bill of lading, 112,000 pounds of rubber were delivered to the carrier at Singapore whereas the total

weight of the bales and chunks delivered in New York was only 105,785 pounds. We are not convinced, however, that the evidence required a finding that there was a loss of rubber beyond that which resulted from its own inherent vice. The test weighing conducted for the respondent showed that the 230 sound bales had lost approximately 690 pounds, a little over one percent of its weight. Expert testimony indicated that this was normal shrinkage for a shipment of this kind. The chunks and pieces weighed 54,955 pounds. These were the remnants of 270 bales which should have weighed in the aggregate 60,480 pounds. Thus these bales lost 5,525 pounds, approximately nine percent of their weight. Lang testified that fused rubber could lose by evaporation four or five percent of its weight. There was additional testimony that fused flat bark rubber tends to adhere to other cargo and that when rubber is forcibly broken out of a ship in chunks little bits and pieces are likely to be lost. Moreover, Megquier testified that when the fused rubber was broken out of the ship the steel bands which had originally held the bales together were discarded as rubbish. Since the bill of lading showed the original weight of 112,000 pounds as "gross and net" it apparently included the weight of these bands. There was testimony that these bands would weigh between $\frac{3}{4}$ and $1\frac{1}{4}$ pounds per bale. Thus the discarding of the steel bands might have resulted in a loss of as much as 263 pounds of the shipment's weight.[1] Adding this figure to the 3,024 pounds which would represent a five percent loss by evaporation gives us a total loss of 3,287 pounds. This leaves only 2,238 pounds or 3.7 percent of the weight of the 270 bales to be accounted for in other ways. As it is not unreasonable to conclude that most of the remaining 2,238 pounds were lost through adherence to other cargo and in breaking the rubber out of the ship, any unaccounted for balance is *de minimis*.

1. Of the 270 bales which required reconditioning 59 bales were apparently whole bales which had suffered oil damage. Thus there would be no loss of steel bands from these bales but only from the remaining 211 bales.

In view of this evidence we think Judge Walsh was not required to conclude that there was a non-delivery of rubber other than that which was lost because of the deterioration of the rubber.

The libelant next contends that Judge Walsh committed error in misplacing the burden of proof. In support of this argument the libelant cites the following language from Judge Walsh's opinion on the motion for reconsideration:

"[Respondent] having established that the stow was proper, the burden shifted to the [libelant] to prove that the rubber was in sound condition when shipped and that it was free from inherent defect which would have caused its deterioration even with proper stow. If libelant could have established this I would then have been in a position to discard the testimony of Captain Allen and substitute my own views as to the propriety of stow."

First of all we think that this language does not require the conclusion that Judge Walsh placed upon the libelant the burden of proof on any issue. All Judge Walsh meant to say, we think, is that respondent's evidence had persuaded him that the stow was proper and that the damage must have resulted from the rubber's inherent vice. Thus if the libelant wished to prevail it must come forward with some further evidence to show that the rubber should have survived the voyage in good condition. This was not a placing of the burden of proof on the libelant; it was merely a statement that the evidence presented by the respondent was the more persuasive.

■ But even if Judge Walsh meant to say that the libelant had the burden of proving that the rubber was in good condition when shipped, he was not in error. In Kupfermann v. United States, 2 Cir., 1955, 227 F.2d 348, 350, we pointed out that "Where the goods themselves contain some basic inherent, and hidden defect there may well be occasion to require proof of good condition upon delivery, * * *." Our prior decisions indicate that when deterioration of the goods may have resulted from a hidden defect, the shipper has the burden of proving their good condition upon delivery to the carrier and to sustain that burden he must present some evidence beyond the bill of lading since the bill of lading is evidence only of apparent or external good condition. The Niel Maersk, 2 Cir., 1937, 91 F.2d 932, certiorari denied 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582; see Stirnimann v. The San Diego, 2 Cir., 1945, 148 F.2d 141, 142. See also Albers Bros. Milling Co. v. Hauptman, 9 Cir., 1938, 95 F.2d 286; Granadaisa Foods, Inc., v. Compania de Navegacao Carregadores Acoreanos, D.C. E.D.N.Y.1956, 139 F.Supp. 538; American Tobacco Co. v. The Katingo Hadjipatera, D.C.S.D.N.Y.1948, 81 F.Supp. 438, 446–447, modified on other grounds, 2 Cir., 1951, 194 F.2d 449, certiorari denied, 1952, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370. There is nothing to the contrary in the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq. The language relating to burden of proof in 46 U.S.C.A. § 1304(2) (q), which the libelant presses upon us, pretty clearly refers only to the carrier's burden of proving that damage comes within subsection (q) and does not relate to the "inherent vice" exception contained in § 1304(2) (m).

■ Since in the instant case the damage may have resulted from a pre-existing condition of the rubber not externally apparent to the carrier, the burden was on the libelant to prove that the shipment was in good condition when delivered to the carrier.

Since Judge Walsh's findings are not clearly erroneous and there is no other error, the decision must be affirmed.