**HELLENIC LINES, Ltd., owner of THE HELLENIC BEACH, Libellant-Appellant,**

v.

**THE EXMOUTH, her engines, boilers, etc., and American Export Lines, Inc., Respondents-Appellees.**

**AMERICAN EXPORT LINES, Inc., as owner of THE EXMOUTH, Libellant-Appellee,**

**Thomas Kenworthy's Sons et al., Cargo Intervenors,**

v.

**THE HELLENIC BEACH, her engines, boilers, etc., and Hellenic Lines, Ltd., Respondents-Appellants.**

**No. 26, Docket 24518.**

United States Court of Appeals Second Circuit.

Argued Oct. 10, 1957.

Decided Jan. 15, 1958.

Writ of Certiorari Denied May 26, 1958.

See 78 S.Ct. 1006.

Clark, Chief Judge, dissented.

Wilbur E. Dow, Jr., New York City (Raymond W. Mitchell, Sonya I. Livshin, and Dow & Stonebridge, New York City, on the brief), for Libelant-Appellant, Hellenic Lines, Ltd., owner of S.S. Hellenic Beach.

James M. Estabrook, New York City (Kenneth Gardner, Walter A. Darby, Jr., and Haight, Gardner, Poor & Havens, New York City, on the brief), for Respondent-Libelant-Appellee, American Export Lines, Inc.

Charles A. Van Hagen, Jr., New York City (Bigham, Englar, Jones & Houston, New York City, on the brief), for Cargo Intervenors-Appellees, Thomas Kenworthy's Sons et al.

Before CLARK, Chief Judge, and LUMBARD and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Shortly after two o'clock in the morning of June 5, 1949 the S.S. Hellenic Beach, owned by Hellenic Lines, Ltd. (libelant-appellant, referred to as "Hellenic"), collided near the entrance to Delaware Bay with the S.S. Exmouth, owned by American Export Lines, Inc. (respondent-libelant-appellee, referred to as "Exmouth").

A libel was filed by Hellenic against Exmouth and a cross-libel filed by Exmouth against Hellenic. In their respective answers Hellenic and Exmouth each accused the other of being at fault. Upon the trial, Thomas Kenworthy's Sons, et al., cargo intervenors, obtained a stipulation that they would be entitled to an interlocutory decree for damage to cargo (some 300 bales of rock wool) on board

the Exmouth should the court hold that Hellenic was solely at fault or that there was mutual fault. The trial court held both vessels at fault. From an interlocutory decree adjudging that Hellenic and Exmouth each recover one-half of their respective damages, including cargo damages, against the other, Hellenic and Exmouth appeal.

Hellenic is a Liberty ship, gross tonnage 7207 tons, 2500 horsepower and a maximum speed of 10½ to 11 knots. Exmouth is a Victory ship, 8500-ton class and a maximum speed of some 17 knots. Hellenic was carrying a cargo of 5,000 tons of grain and 300 tons of general cargo; Exmouth had about 133 tons of cargo on board.

Less than a half hour before the collision Exmouth, bound from New York to Philadelphia, was anchored because of fog approximately one and one-half miles southeast of Overfalls Lightship near the entrance of Delaware Bay. At about ten minutes before 2:00 A.M. she weighed anchor and proceeded in a westerly direction passing the lightship about one-quarter mile south. At approximately the same time Hellenic, which had stopped to drop its river pilot at a point some 1.4 miles in a northwesterly direction (290° true) from the lightship, resumed its course (124° true) towards the ocean. Prior to the collision each vessel observed the lights and the course of the other although there is a fairly substantial difference in the estimate of the miles they were apart at the time. Visibility was about five miles and there was a northwesterly tidal current of over two knots.

On the bridge of Hellenic were the master, the second mate and the helmsman. The Hellenic observed the masthead lights and the green starboard light of Exmouth about 2 to 4 points on her port bow. On the bridge of Exmouth were the master, the third mate and the helmsman. The Exmouth observed the lights of Hellenic which was showing its red port light about 4 points on the starboard bow.

■ Under the rules of the road Hellenic was clearly the privileged vessel (Art. 19, 33 U.S.C.A. § 204). Exmouth was the burdened vessel and under a duty to keep clear of Hellenic and to give way. On the trial the Exmouth Captain himself admitted that "the Exmouth had to keep out of the way, we were the burdened vessel." and Exmouth's third mate said that the rules required Exmouth "To give way, to stop engines or to reverse." She engaged in none of these operations but continued on at a speed of 15½ to 16 knots.

As the vessels approached each other the Hellenic blew one blast when the ships were about one-half mile apart signifying a port-to-port passing. This signal being unanswered by Exmouth, Hellenic blew another blast when they were about one-quarter of a mile apart. Exmouth then blew two blasts. Because of this cross-signal Hellenic put her helm hard right and her engines full astern. There was also testimony that she blew several short blasts as an alarm signal. Exmouth continued on without slackening her speed and while crossing Hellenic's bow was struck by Hellenic somewhat abaft her beam in the vicinity of Exmouth's number 4 hold, at an angle estimated at about 110°. Although Hellenic's bow cut into Exmouth's side the ships did not lock and Hellenic fell off astern of the Exmouth.

After Hellenic was sighted by Exmouth there was considerable confusion on Exmouth's bridge. Being the burdened vessel it was Exmouth's duty to keep clear of Hellenic. Had Exmouth veered to the right in a northerly direction a port-to-port passing could have been effected. This should have been normal procedure regardless of the presence of Hellenic because the pilot boat and Exmouth's ultimate destination were toward the north. Continuation of a due westerly course would have caused Exmouth to run ashore in a very short time. The Captain of Exmouth, however, gave the command to come to the left. The helmsman said "You mean right, Captain" and immediately the third mate added "Yes, that's right, you will have to come to the right." The Captain, never-

theless, persisted by saying "Hard left" and the helmsman obeyed these orders. If Exmouth had turned to the right at the time the Hellenic was observed, the collision could undoubtedly have been avoided. Finally, when the vessels were but a short distance apart the Exmouth Captain ordered the helmsman to come to the right but too late to avoid collision.

The fault of Exmouth was clearly stated in the opinion of the trial court as follows: "The 'Exmouth' not only failed to keep out of the way of the 'Hellenic Beach' in clear violation of Rule 19, supra (33 U.S.C. sec. 204), but her master navigated her in such a faulty manner as to make the collision inevitable. There was testimony to the effect that Captain Ecklund was intoxicated during his aforementioned supervision of the navigation of the 'Exmouth' but, regardless of the cause of his faulty navigation, there appears to be no doubt that he operated the 'Exmouth' in clear violation of International Rule 19 (33 U.S.C. sec. 204)."

The trial court, however, also found that Hellenic was at fault. In his opinion he said that Hellenic "did nothing to avoid the collision which was then so imminent" and found that she was "bound to take the necessary precautionary action to avoid the collision under the special circumstances of the situation * * *" The testimony is undisputed that Exmouth did not diminish her speed and that her navigation at the time of approaching danger was highly confused. The evidence is clear that it was Hellenic that took such actions as were possible in view of Exmouth's navigation in an endeavor to avoid a collision. The conclusion is inescapable that Exmouth was solely at fault.

Under ordinary circumstances Hellenic, as the privileged vessel, was entitled to maintain her course and speed. If Hellenic had to speculate that Exmouth would not obey the rules and engage in avoiding action on that assumption, the rules might as well be discarded. Navigation would be reduced to a game of bluff (Wilson v. Pacific Mail S. S. Co., 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651;

The Delaware, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771; National Bulk Carriers v. United States, 2 Cir., 1950, 183 F.2d 405; Pacific-Atlantic S. S. Co. v. United States, 4 Cir., 1949, 175 F.2d 632). Exmouth's duty was well defined in The Nereus, D.C.S.D.N.Y.1885, 23 F. 448, 455, the court saying: "A steamer bound to keep out of the way of another steamer by going to the right, * * * has no right, when under no stress of circumstances, but merely for her own convenience, to give the other steamer a signal of two whistles, importing that she will go to the left, unless she can do so safely by her own navigation, without aid from the other, and without requiring the other steamer to change her course or her speed. Otherwise she would be imposing upon the latter steamer more or less of the burden and the duty of keeping out of the way, which by statute is imposed on herself."

This does not mean that the last clear chance rule strongly advanced by Exmouth is to be ignored. Its application, however, depends upon the facts. Here Exmouth had ample room and time in which to maneuver to avoid the collision. Hellenic had every reason to believe that Exmouth would keep clear. Only when Hellenic heard Exmouth's two blasts was there any indication to the contrary. Even then it was Hellenic which reversed at full speed. Exmouth did nothing to avoid a collision although its two blasts showed consciousness of danger. Upon the facts the last clear chance rule cannot be availed of by Exmouth to create a mutual liability situation.

■ Exmouth and the court below rely heavily upon a case brought against American Export Lines, Inc., and Hellenic Lines, Inc., by Rivera, a seaman on the Exmouth, for injuries sustained in the collision as establishing mutual fault and liability. The trial court found as a conclusion of law that the verdict for personal injury damages in that case "is dispositive of the issues in the case." In the Rivera case, Rivera v. American Export Lines, D.C., 13 F.R.D. 27 plaintiff, Rivera, sought judgment against

Exmouth and Hellenic. Both Hellenic and Exmouth, in their Rivera answers, as a "separate, partial and complete defense" denied their own liability and alleged: (1) fault on the part of the co-defendant; (2) that "if any liability for such damage should be adjudged against defendant," it would be entitled to an indemnity from the other; and (3) that all liability should be borne by the other. No cross-claim or third party complaint was filed nor did the present parties treat this seaman's action as a real adversary proceeding.

The party seeking to invoke the doctrine of estoppel by judgment or collateral estoppel must show (1) that the issue which his opponent wishes to litigate has already been completely adjudicated and (2) that such adjudication was rendered in a proceeding where the two parties were adversaries. See Geo. A. Fuller Co. v. Otis Elevator Co., 1918, 245 U.S. 489, 38 S.Ct. 180, 62 L.Ed. 422. Neither condition is met here. In the first place the causes of action are not the same. The Rivera action was brought for personal injuries. The instant proceeding is one for collision damage brought in admiralty. In the Rivera action there would have been no occasion for the application of the doctrine of Major-Minor fault or of error *in extremis*, both integral parts of the admiralty law relating to collision liability.

Furthermore, libelant cannot be deprived of litigating the hull damage issue in admiralty and in an adversary proceeding merely because a stranger to that action elected to join it as a co-defendant in a personal injury action. In the present case neither bar nor estoppel was pleaded. To the contrary the parties fully tried the case on the merits. The Rivera judgment only awarded personal injury damages against both defendants. Employers Liability Ins. Co. v. Post & McCord, 286 N.Y. 254, 36 N.E. 2d 135 and Yellow Cab Co. of D. C. v. Janson, 1949, 86 U.S.App.D.C. 38, 179 F.2d 54, do not provide precedent for the cross-libelant's argument that the joint Rivera judgment prevents further litiga-

tion of the mutual liability issue in the subsequent hull damage trial. Had either Hellenic or Exmouth sought to recover from the other its portion of the amount paid to Rivera those cases might have been authority for the proposition that the Rivera judgment estopped the parties from raising the issue of mutual liability but this is *not* such a suit. McAfoos and Neff v. Canadian Pacific Steamships, Ltd., 2 Cir., 1957, 243 F.2d 270, dealt only with the question of election between admiralty and law where the issues were identical. It does not bear upon the problem here.

The parties here did not litigate *inter se* the issue of negligence in the Rivera case, and had no intention of doing so. In fact counsel for the Hellenic Lines, at the pre-trial conference in Rivera, were willing to contribute to any recovery which the seaman might be awarded, provided that if Exmouth were held fully liable in the collision suit, Hellenic would recover its contribution. And apparently one other claim was actually settled on this basis.

That the answers of both parties in the Rivera case sought to put the blame on the other is no bar. " * * * where a person is injured by the concurrent negligence of two tortfeasors who are joined in one action, the fact that each of them attempts to show that the other was solely responsible for the accident or that the other alone was negligent does not make the issue of negligence res judicata in subsequent proceedings between them * * *" Restatement of Judgments § 82, comment (b). Nor does the fact that the parties had an opportunity to litigate the issue of negligence *inter se* in the Rivera action bar the present libel. The doctrine of collateral estoppel *"does not mean that questions which were not, but might have been, raised in the former action cannot be litigated in the second action, or that the subsequent action is barred."* (Emphasis in the original.) Speed Products Co. v. Tinnerman Products, 2 Cir., 1955, 222 F.2d 61, 67. See also: Commissioner of Internal Revenue v.

Sunnen, 1948, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898; Restatement of Judgments § 68 (1942).

Nor is Judge Leibell's decision (13 F.R.D. 27) allowing the use in the Rivera matter of depositions taken in the instant case, and relied on by the trial court, inconsistent with our present holding. The primary factual issues underlying the two cases were sufficiently similar to allow the use of these depositions; but the inferences to be drawn from these primary facts in the two cases and the rules of law applicable to each, present no real identity of issue so as to operate as an estoppel by judgment.

Decree reversed. The Exmouth is held solely liable and the case is remanded for further proceedings.

LUMBARD, Circuit Judge (concurring.)

I concur in Judge MOORE's opinion. I wish, however, also to record my agreement with the views of Judge CLARK regarding the unwarranted delays in the course of this litigation.

CLARK, Chief Judge (dissenting).

Admittedly the Exmouth was navigated negligently. But admittedly, also, the Hellenic's navigators made no attempt to slow down or otherwise avoid the accident until it was too late. Perhaps the circumstances excused them, but quite clearly there was a question for the trial court whether or not the Hellenic's crew was negligent in failing sooner to take a course of action to avoid the collision. In retrospect it is apparent that when the ships were half a mile apart they were on a crossing course. This fact should have occurred to the crew of the Hellenic, for at this distance the green starboard lights of the Exmouth clearly were visible to them. Nevertheless the Hellenic continued on the same course at unabated speed. Not until the ships were less than one-quarter mile apart did the Hellenic attempt to avoid the collision by turning right and reversing engines. The court below, obviously in a much better position than we to judge the credibility of the testimony, determined that the navigator of the Hellenic depended unjustifiedly on the expected action of his opposite number and continued without slackening speed after he was or should have been aware of the danger. This is a realistic and reasonable decision on the facts and, in my opinion, requires affirmance. The conduct thus found is as bad for safety at sea as it would be for an autoist to rely on a green light at a street intersection when he sees that a crossing auto is not heeding a red light. Lady Nelson, Ltd. v. Creole Petroleum Corp., 2 Cir., 224 F.2d 591, 593, certiorari denied 350 U.S. 935, 76 S.Ct. 308, 100 L.Ed. 817.

In addition, the prior verdict and judgment in Rivera v. American Export Lines, Civ.No. 53–207, D.C.S.D.N.Y., May 2, 1952, clearly established the Hellenic's negligence; and that finding should be res judicata in this case. There, in an action for personal injuries brought against these two parties by an Exmouth seaman, he charged concurrent negligence, which of course he had to prove, and did in getting a $90,000 verdict, paid one-half each by these defendants. Each denied its own negligence and as a second defense pleaded the other's negligence, adding, e. g., "and if any liability for such damage should be adjudged against defendant, Hellenic Lines, Ltd., the defendant, Hellenic Lines, Ltd., would be entitled to indemnity from said defendant, American Export Lines, Inc., and all liability should be borne by said American Export Lines, Inc., instead of defendant, Hellenic Lines, Ltd." The issues of negligence appear to have been thoroughly explored and the absence of a formal cross pleading seems of little moment because the codefendants were obviously adverse parties. Requiring a formal cross pleading (i. e., with a prayer for some relief) seems to me overtechnical when the circumstances show the issues to have been actually tried—a formality not in keeping with federal pleading, where under the well-known Rule 54(c), F.R.Civ.P., the demand for judgment is no limitation when the stage of potential default is passed.

The opinion also suggests that the issue of hull damages was not before the court and jury in the Rivera case and therefore neither party is estopped here. This seems to me a totally unwarranted limitation on the doctrine of collateral estoppel, for the cause of both the personal injury and the property damage was concurrent negligence which was adjudicated. Once such negligence is adjudicated, it is settled thereafter, whatever be the court where the issue is later raised or the nature of the damages there claimed. See, e. g., Little v. Blue Goose Motor Coach Co., 346 Ill. 266, 178 N.E. 496; Fleischer v. Detroit Cadillac Motor Car Co., Sup., 165 N.Y.S. 245; and other cases cited in 2 Moore's Federal Practice 379, note 88 (2d Ed. 1948) and the annotation 104 A.L.R. 973. The only possible qualification is that, even if the Hellenic was negligently navigated, she still might be excused from liability under the "major-minor" fault rule in admiralty. But that was rejected— and quite properly so—by the trial judge here, leaving collateral estoppel naturally effective and requiring the judgment rendered.

While I thus accept the district court's conclusion and judgment I am constrained to feel that the long delays in this litigation require comment. The libel itself was promptly filed within two weeks of the accident. Then ensued a period of inaction for five years and seven months until trial. Perhaps counsel had reasons not apparent to us for this delay—amounting, indeed, to nearly three years after the completion of the seaman's jury trial; but the current public concern with legal delays hardly envisages such reasons. At any rate the court took eight and one-half months for its opinion, based on findings which, it does seem, would have been fresher and clearer to it at the close of the evidence.[1] Then, for reasons not apparent, since its opinion was quite adequate,[2] the court called for proposed findings and took an additional fifteen months to make findings which summarize but do not add to the opinion. This last quite inexplicable delay in particular is of a kind which has caused us continued concern in our many decisions enforcing the civil rule for the prompt entry of judgment.[3] Another year will be consumed by the appeal. I suggest that none of us can feel proud of this record.

---

1. Polarus S. S. Co. v. The Sandefjord, 2 Cir., 236 F.2d 270, 272, certiorari denied Viriks Rederi A/S v. Polarus S. S. Co., 352 U.S. 982, 77 S.Ct. 383, 1 L.Ed.2d 365; Hecht, Levis & Kahn, Inc. v. The President Buchanan, 2 Cir., 236 F.2d 627, 629; Grace Line v. The C. Hayward Meseck, D.C.S.D.N.Y., 150 F.Supp. 425, affirmed 2 Cir., 248 F.2d 736.

2. See F.R. 52(a) as amended and Hecht, Levis & Kahn, Inc., v. The President Buchanan, supra note 1, 2 Cir., 236 F.2d 627.

3. See, e.g., United States v. Wissahickon Tool Works, 2 Cir., 200 F.2d 936; F. & M. Schaefer Brewing Co. v. United States, 2 Cir., 236 F.2d 889, 893, certiorari granted United States v. F. & M. Schaefer Brewing Co., 353 U.S. 907, 77 S.Ct. 667, 1 L.Ed.2d 662; Matteson v. United States, 2 Cir., 240 F.2d 517; Edwards v. Doctors Hospital, 2 Cir., 242 F.2d 888; Repan v. American President Lines, 2 Cir., 243 F.2d 876.