**UNITED STATES of America**

v.

**LYKES BROS. STEAMSHIP CO., Inc., In Personam and SS MARJORIE LYKES, Her Engines, Tackle, etc., In Rem.**

**Civ. A. No. 69–H–339.**

United States District Court,
S. D. Texas,
Houston Division.

Nov. 10, 1971.

Tex., Anthony W. Gross, Admiralty & Shipping Sec., Department of Justice, Washington, D. C., for United States of America.

Royston, Rayzor & Cook, Houston, Tex. (George W. Renaudin and Kenneth D. Kuykendall, Houston, Tex.), for defendant.

SEALS, District Judge.

MEMORANDUM OPINION:

The United States brings this cause of action in admiralty against defendant shipper for alleged damages to a shipment of whole wheat under transport to Poland for the use of CARE, Inc. CARE purchased the flour in Fort Worth and shipped it by rail to Houston, where it was loaded onboard the S/S Marjorie Lykes on June 13 and 14, 1965. Enroute to Poland, the vessel docked at Beaumont, Texas, where a strike by the Marine Engineers Beneficial Association compelled it to remain for nearly three months. While the ship was strikebound in Beaumont, a routine cargo inspection by defendant revealed that the flour had been infested by weevils. The flour was nevertheless carried to Poland after the termination of the strike, but CARE's representative there rejected it as unfit for human consumption. The Government seeks damages for the loss of this cargo in the amount of $21,751.78.

The Government posits its claim upon two basic contentions: 1) that defendant failed to deliver the cargo in the same good order and condition as when received; and 2) that defendant is not entitled to disclaim liability under 46 U.S.C. § 1304, which provides that a carrier is exempted from responsibility for damage to a cargo resulting from a strike or work stoppage. Defendant asserts, on the other hand, that the cargo was not in actual good order at the time it was delivered to the carrier, and that the infestation of the flour was the result of the inherent vice of the commodity. Defendant further maintains that it is entitled to claim the benefit of the strike exception, 46 U.S.C. § 1304. The parties

Anthony J. P. Farris, U. S. Atty., B. Stephen Rice, Asst. U. S. Atty., Houston,

agree that plaintiff, in order to prevail, has the burden of demonstrating the *actual* good order and condition of the cargo at the time of delivery to the vessel, and that issuance of a clean bill of lading is evidence only of the *apparent*, rather than the *actual*, good order and condition of the commodity.

1.

### Procedures at the Graham and Seguin Mills

The Government attempts to discharge its burden of demonstrating the actual good condition of the flour at the time of its delivery to defendant by detailing the procedures undertaken prior to such delivery. Three rail carloads of flour were milled at Graham, Texas. Upon arrival at the mill, the grain was placed in a steel storage tank, where it was fumigated with cyanide gas. After passing through several processes for the removal of foreign matter, the grain was milled, transported to bins, and mechanically packed into bags. During packing, samples of the flour were taken and sent to a commercial laboratory, which was supposed to notify the Department of Agriculture if analysis of the flour revealed evidence of filth. The commodity inspection certificates for the three carloads milled at Graham make no mention of filth.

The bagged flour was loaded into the cars, which were sealed with masking tape, and then fumigated with 15–20 pounds of methyl bromide per car. The Government's witness, Dr. Lyman Henderson, at first asserted that 15–20 pounds of methyl bromide per carload would insure a 100 percent kill. On Cross-examination, however, Dr. Henderson declined to affirm such a precise figure. On the other hand, plaintiff's entymology expert, Mr. J. C. Cook, testified unequivocally that 15–18 pounds of methyl bromide might kill nearly all adult insects infesting the flour, but could certainly not kill all eggs. Mr. Cook explained that the cost of guaranteeing a total kill of all eggs in a particular carload would be prohibitive. Within

a few weeks, then, of fumigation with methyl bromide, a fresh supply of adult insects would be present in the flour.

Six carloads of flour were milled at Seguin, Texas. Upon arrival at Seguin, the grain was placed in a storage elevator and fumigated with phototoxin. The grain was subsequently subjected to procedures similar to those employed at the Graham mill. Samples of the flour were sent to a commercial laboratory and to the Department of Agriculture's Galveston office, which in turn sent one sample per contract to Agriculture's laboratory in Beltsville, Maryland. Apparently, no infestation was found as a result of these analyses, for the commodity inspection certificates for these six cars disclose no such information. The loaded railroad cars were sealed and fumigated with 18 pounds of methyl bromide. As with the Graham carlots, those from Seguin doubtlessly concealed live eggs which survived application of the methyl bromide and subsequently developed into adult insects.

The Court concludes, based upon the testimony of Dr. Henderson and Mr. Cook, that the Government has failed to discharge its burden of demonstrating the actual good order and condition of the cargo upon its arrival in Houston. The Court is further convinced that live eggs infested the flour, and constituted an inherent vice in the cargo at the time its custody was transferred to defendant.

2.

### Transfer of Custody to Defendant

Delivery of the flour was made to defendant on May 26, May 27, June 7, and June 8, 1965. Defendant's wharf receipts bear the notations that six of the nine lots of flour were fumigated at the time of delivery. Defendant's wharf foreman, Mr. Jack Moran, testified that this fumigation was necessary because infestation was discovered when the rail cars were opened.

On June 12, the S/S Marjorie Lykes was inspected by an examiner from the Houston Merchants' Exchange, and a cer-

tificate was thereupon issued certifying that the vessel's holds were free of live infestation. The flour was loaded into the vessel's Number 4 lower hold on June 13 and 14. Seven hundred fourteen bags of milo were loaded directly on top of the flour, separated from it by large sheets of cardboard.

Defendant argues that the necessity of fumigating six of the nine carlots provides further evidence of the inherent vice of the community. The Government contends, however, that, if such fumigation were indeed necessary, defendant violated specific written instructions from the Department of Agriculture regarding the disposition of infested commodities. The Government relies on a letter, dated March 1, 1965, from the manager of the Department's Houston office addressed to "All Railroads Delivering CCC Commodities to Ports in the Gulf and South Atlantic." The letter states that copies were to be forwarded to "Steamship Companies," and the Government's witness Overby testified that defendant received a copy.

The letter directs that:

"All cars found insect infested at time of unloading are rejected to the railroad for account of the shipper. A copy of the letter rejecting the lot is to be forwarded to this office by the freight forwarder.

If the railroad or shipper elects to fumigate cars and obtains a USDA, AMS, commodity inspection certificate indicating the commodity is free of infestation, we will accept the car provided the steamship company will issue a clean ocean bill of lading. Under no condition will a car be loaded to vessel until AMS has inspected and found commodity to be free of live infestation. If live or dead infestation is found inside containers, the entire carload lot is rejected."

The Government maintains that, because defendant neither rejected the infested carlots nor obtained a commodity inspection certificate, defendant is estopped to assert that the cargo was not in actual good order and condition at the time of delivery.

■ At best, these instructions present numerous ambiguities. At worst, they impose no duty whatsoever on defendant. In the first place, the letter is addressed to "Railroads." Copies are to be provided to "AMS Area Offices," "Freight Forwarders," "SS companies," and "Port Directors and Facility Operators." The Court takes judicial notice, that customarily, the notation "copies to" appended to the end of a letter signifies that the parties listed thereunder are receiving the letter for information purposes only. Presumably, had Agriculture's area representative wished to convey specific instructions to parties other than "Railroads," he would have addressed letters to such parties.

■ Paragraph 1 of the directions, by employing the passive voice of the verb, fails to denote the party on whom the responsibility for rejection lies. A similar use of the passive in the second and third sentences of paragraph 2 leaves the reader totally unenlightened about the identity of the party or parties required to act. Presumably, however, all the instructions are directed to the addressees of the letter, i. e., "Railroads." In short, the instructions, viewed in the light most favorable to the Government, are so vague and ambiguous that defendant must be held to have had no notice that it was expected to do anything. The Court concludes that defendant was under no duty to comply with the directions of the letter and that, therefore, defendant is not, for such reason, estopped to assert that the cargo was not in actual good order and condition at the time of delivery.

The Government also attempts to demonstrate defendant's negligence by arguing that the stowage of milo and flour together is improper and that defendant is responsible for the damage resulting from improper stowage. The Government's witness, Dr. Lyman Henderson, testified that because milo, as an animal feed, might be shipped with some insect

fragments, and because weevils can fly, it is not desirable to store the two cargoes in proximity to each other.

The Government has not presented any evidence, however, that the stowage which defendant provided herein was other than that normally afforded by carriers. It is the obligation of the shipper to provide particularized instructions for special cargoes. Under the terms of the bill of lading, the shipper's failure to inform the carrier of the special nature of the cargo relieves the carrier of obligation for the loss of such cargo. Furthermore, as previously demonstrated, there is strong evidence to indicate that the cargo was already infested at the time of its delivery to defendant. In such event, even were it clear that weevils from the milo further infested the flour and that stowage of the milo in close proximity to the flour constituted a negligent act on the part of defendant, there is absolutely no evidence as to what portion of the damage resulted from the flour's infestation by insects from the milo. The Court simply does not have sufficient evidence on which to make an informed guess as to the possible contribution to the damage of the stowage of the milo, and the Court declines to speculate.

### 3.

### *The MEBA Strike*

The S/S Marjorie Lykes sailed from Houston and arrived in Beaumount on June 15, 1965. At midnight on June 15, the Marine Engineers Beneficial Association instituted a work stoppage. The following day, the crew was paid and the vessel was secured for the duration of the strike. The MEBA was the only seaman's union that stopped work. Labor negotiations were in progress at the time the strike was instituted. Defendant had representatives in New York engaged in bargaining with the MEBA. Both CARE, Inc., and the Government were aware of the potential strike prior to its commencement.

The Government contends that defendant loaded the cargo and sailed the vessel to Beaumont with the express knowledge that Beaumont would shortly be strike-bound. The parties agree that the carrier is exempted from liability for damage to cargo resulting from a strike under 46 U.S.C. § 1304, provided that nothing therein may be construed to relieve a carrier of responsibility for the carrier's own act.

The Government has failed to persuade the Court that defendant was unreasonable in docking the S/S Marjorie Lykes at Beaumont. The Court finds that the representatives of defendant engaged in contract negotiations with the seafaring unions at midnight on June 15, 1965, reasonably anticipated that no work stoppage would occur. Indeed, only the MEBA, of all the seafaring unions, actually instituted a strike. Defendant might also have reasonably expected that a Taft-Hartley injunction would be obtained within a short time of a work stoppage of any union. The Court is convinced that no culpable act or omission by defendant contributed substantially to the outbreak of the strike.

Furthermore, the Court finds that the Government was at least as knowledgeable as defendant about the possibility of a strike. Certainly, defendant has demonstrated sufficient good faith and freedom from responsibility in this regard to bring itself well within the strike exception provided in 46 U.S.C. § 1304.

### 4.

### *Discovery of Infestation*

The Government contends further that, even if defendant cannot be held liable for failure to anticipate the strike, defendant nevertheless failed to properly care for the cargo while it was aboard the ship. On August 19, 1965, a checker employed by defendant discovered that the flour cargo in the lower number 4 hold was infested with live weevils. On August 26, defendant notified CARE, Inc., of the infestation and requested instructions. Neither CARE nor the Department of Agriculture provided any directions, whereupon defendant ar-

ranged for the fumigation of the cargo. After this fumigation, the Beaumont Board of Trade inspected the vessel and issued a certificate stating that the visible areas of holds 1, 2, 4 and 5 were clean, dry and free of weevil infestation.

The parties agree that the burden of proving its freedom from fault is on the carrier. Defendant's witness Mr. John Young, employed by defendant to make cargo inspections, testified that he checked the holds of the Marjorie Lykes every seven to ten days during the period of the strike. Young stated that, at the time he discovered the weevils, during his inspection of August 19, one to two weeks had elapsed since his last check. Checker Young reported the infestation to a Lykes Brothers official, but, by the time the information had inched its way through bureaucratic channels to the official responsible for notifying the shipper, seven days had passed. In a letter dated August 26, defendant informed CARE, Inc., that inspection had revealed weevil infestation, and requested instructions from CARE. Receiving none, defendant undertook on its own initiative to fumigate the cargo, and so informed CARE, Inc., on August 31, 1965. The fumigation was carried out on September 6.

The Court is not convinced that the defendant has demonstrated its freedom from negligence. In the first place, Checker Young, although he boarded the vessel every seven to ten days, testified to his actual presence in hold number 4 on only one occasion, the August 19 visit during which he discovered the infestation. Furthermore, defendant failed even to notify the shipper of the infestation until a full week had passed, and then chose to notify shipper by mail. Finally, defendant compounded its negligence by failing to fumigate until September 6, a full eighteen days after the initial discovery of the infestation.

■ The Court finds that defendant has failed to discharge its burden of showing itself free of fault during the period in which the vessel was strikebound at Beaumont. Whatever may be said for the quality and frequency of defendant's inspections during a normal situation, it is clear that those efforts were insufficient to relieve the carrier of responsibility in the peculiar conditions involved herein. The existence and the duration of the strike, the semitropical climate of the summer months along the Texas coast, the carrier's awareness of its obligation to prove itself, in case of damage, free of fault—all these factors, when considered together, oblige the Court to conclude that defendant has not demonstrated its freedom from negligence in caring for the cargo.

## 5.

### *Conclusions*

In summary, the Court has found (1) that the Government has failed to demonstrate the actual good order and condition of the cargo upon its arrival in Houston; (2) that defendant had no duty to comply with Department of Agriculture instructions contained in a letter addressed to "Railroads" and dated March 1, 1965; (3) that there is insufficient evidence to establish what part of the infestation, if any, resulted from defendant's storage of milo in proximity to the flour; (4) that defendant has sufficiently shown itself entitled to claim the strike exception of 46 U.S.C. § 1304; and (5) that defendant has failed to demonstrate its freedom from negligence in caring for the cargo.

■ On these findings, there is a dearth of authority regarding ultimate responsibility for the cargo damage. What authority there is suggests that the Government's failure to demonstrate the actual good order and condition of the cargo at the time of delivery to defendant is fatal to its cause. In M. W. Zack Metal Co. v. S/S Birmingham City, 311 F.2d 334 (C.A.2, 1962), cert. den. 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d·51 (1963), the Second Circuit held that:

"Under the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1303, 1304, the cargo owner bears the burden of proving delivery of the goods in good condition and outturn by the vessel, or by the

stevedore for whose conduct the vessel was responsible, in damaged condition. The burden then shifts to the vessel to prove the damage occurred through a cause excepted under the Act or the exercise of due diligence to prevent the harm * * * If the cargo owner fails to sustain its burden, its libel must be dismissed, even if the cause of the damage found at the point of ultimate destination may still remain in nubibus." *Id.*, at 337.

The Court concludes that, the Government having failed to discharge its burden of proof, defendant must prevail. Accordingly, it is adjudged that plaintiff should take nothing by this cause of action, after affording plaintiff the opportunity to object to its form, defendant will submit to the Court within ten days from the date of this Memorandum Opinion a final judgment not inconsistent with the findings of fact and conclusions of law expressed herein.

The Clerk will file this Memorandum Opinion and provide counsel for all parties with true copies.