UNITED STATES of America,

v.

CENTRAL GULF STEAMSHIP CORPORATION and Robert H. Wall, Inc.

UNITED STATES of America,

v.

ROBERT H. WALL, INC. and Central Gulf Steamship Corporation.

Nos. 7538, 7735.

United States District Court, E. D. Louisiana, New Orleans Division.

Feb. 24, 1972.

Gerald J. Gallinghouse, U. S. Atty., John R. Schupp, Asst. U. S. Atty., New Orleans, La., Anthony W. Gross, Admiralty and Shipping Section, U. S. Dept. of Justice, Washington, D. C., for the United States.

John R. Peters, Jr., Robert B. Acomb, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Central Gulf Steamship Corp. and Robert H. Wall, Inc.

HEEBE, District Judge:

This case arose out of a claim by the United States on its own behalf and as subrogee of the United Nations Relief and Works Agency (UNRWA) to recover damages it suffered due to the infestation of a large quantity of enriched bread flour destined for export as part of a government program to furnish economic aid to needy countries. While the 40,428 bags which each contained 100 net pounds of flour were in Pensacola, Florida, awaiting shipment by the defendant Central Gulf Steamship Corporation, it was discovered that almost all of the flour was infested. Attempts to fumigate the flour failed to successfully eradicate all of the insects and the flour was pronounced unfit for human consumption. The entire Pensacola shipment was sold "as is-where is" on the condition that it be used for other than human consumption. The Department of Agriculture accepted the highest responsive offer and sold the flour for $1.06 per bag which the parties stipulated was a reasonable price (Stipulation of July 21, 1971, ¶ 2).

The parties stipulated that the original price paid for the flour was $230,261.00, and that this price was reasonable. Considering additional expenses such as wharfage and handling, sampling expenses, and additional freight charges, the government expended $250,023.38. Since $42,816.58 of this was recouped when some of the bags were salvaged, the government's losses amounted to $207,206.80 (Stipulation of August 16, 1968 and July 21, 1971; oral stipulation during trial).

The federal courts have jurisdiction over this case because it is a suit in contract brought by the sovereign for damages. For purposes of obtaining jurisdiction over the defendants Robert Wall, Inc., and Central Gulf Steamship Corporation, the government commenced two separate suits, one in this court and one in the United States District Court for the District of Columbia. The District of Columbia suit was transferred to this Court, and by an order dated January 11, 1966, the two suits were consolidated.

The flour we are concerned with here was to have been shipped from Pensacola, Florida, to Aqaba, Jordan, on July 21, 1964, but the defendant did not present a vessel in Pensacola until August 10, 1964. A companion case in another section of this court dealt with a shipment of a much smaller quantity of flour from New Orleans to Port Said. United States v. Central Gulf Steamship Corp., D. C., 321 F.Supp. 945 (1970). In that case, which, at the time of writing, is on appeal to the Fifth Circuit, it was held that the government could recover damages from the defendants for the losses they sustained due to the infestation. Although the thoroughness of

the opinion caused us to be influenced by it, that case is not controlling here.

All of the approximately 1,834 metric tons of flour involved here were milled in Kansas City, Kansas by Flour Mills of America during June, 1964 and were shipped from Kansas City by railcars between June 23, 1964 and June 26, 1964. The flour arrived in Pensacola between June 27, 1964 and July 2, 1964 and was unloaded between June 30, 1964 and July 9, 1964. It was then stored in a warehouse owned by the Pensacola Port Authority where it remained through the time the infestation was discovered.

There are three primary issues involved in this dispute. First, has the Carriage of Goods by Sea Act (Cogsa) been made applicable to the contract between the parties through its incorporation in the bill of lading? Second, if it has, does Central Gulf bear the burden of proving the applicability of one of the Cogsa exceptions which would relieve it of liability, and has it sustained this burden? Third, did Central Gulf breach its contract when it delayed in presenting a vessel to transport the flour from Pensacola.

For the reasons set forth below, we have answered the first two questions affirmatively and the third question negatively.

## I. CONTRACT BETWEEN THE PARTIES

### A. The Bill of Lading

The contractual agreement between the government and Central Gulf developed from a series of negotiations in the spring and summer of 1964. The Ocean Transportation division of the United States Department of Agriculture solicited offers to transport the 1,834 tons of flour from nine ocean carriers with sailings to the Persian Gulf. Robert Wall, Central Gulf's Washington agent, relayed the request to Central Gulf which submitted an offer on June 5, 1964 to ship the flour on the SS GREEN VALLEY or substitute on July 21, 1964 for the standard conference rate of $33 per metric ton. The government accepted this offer over that of the one other company which had submitted an offer.

On June 10, 1964 Wall forwarded to Joseph Ryan, Chief of the Ocean Transportation Service Division of the Department of Agriculture, Central Gulf's Freight Engagement (Wall Exhibit 2) along with Central Gulf's bill of lading (Grehan Exhibit 1). On June 25, 1964, Ryan sent Wall a document referred to as a Booking Confirmation (Wall Exhibit 4).

There is a dispute as to which document or documents form the contract between Central Gulf and the government. It is the latter's position that no contract was evidenced in writing until the Booking Confirmation was signed and that the Freight Engagement and bill of lading are not part of any contract. We partially disagree because we have concluded that the bill of lading forms part of the contract between the parties. We were not presented with sufficient evidence to establish that the Freight Engagement forms part of the contract. It can be viewed as an offer by Central Gulf but no proof of acceptance was presented. In fact, Joseph Ryan testified that although his office received a copy of the document, it was not in his hands because when he receives letters like this, he routes them to someone and his handwriting would be in the right hand corner (J. Ryan Deposition, pp. 11–12), but there is no notation of any kind there. We, therefore, conclude that the Freight Engagement is a unilateral writing which was never specifically agreed to by the government.

We have concluded that the bill of lading does form part of the contract between the parties because the Booking Confirmation does not embody the entire agreement between the government and Central Gulf since the parties manifested an intention both before and after the Booking Confirmation was signed that the bill of lading would form part of the

contract and because the government knew it was the normal business practice of an ocean carrier to issue a standard bill of lading like the one which was issued.

■■ Contrary to the government's assertion, the Booking Confirmation does not embody the complete agreement between the parties. It is merely the brief expression of preceding negotiations and exchanges of documents which, taken as a whole, delineate the details of the contract. The bill of lading was one of the documents which was exchanged (Trial Testimony, p. 300). As Corbin explains, a written contract need not be embodied in a single document nor must the series of documents forming the contract be attached:

"In the process of making a contract, either orally or in writing, the parties may express their assent piecemeal, agreeing upon individual terms as the negotiation proceeds . . . there is no contract until the parties close their negotiation and express assent to all the terms of the transaction together. [Citing Fire Ass'n of Philadelphia v. Allis-Chalmers Mfg. Co., 129 F.Supp. 335 (1955)] In giving expression to such a final assent, however, the parties frequently do not restate the various terms that they have previously tentatively agreed upon. Those terms may be either formally or tacitly incorporated by reference." (§ 31, p. 120. See also § 573, n. 3, and § 578)

Furthermore, the Booking Confirmation is not an integrated writing within the meaning of Restatement of Contracts, § 228, which explains that "an agreement is integrated where the parties thereto adopt a writing or writings as the final and complete expression of the agreement." The Booking Confirmation is not the complete expression of the agreement here. On its face it refers to other documents including the bill of lading, at least in regard to expenses the carrier may incur in delivering the cargo at its destination, and it does not cover all of the terms of carriage.

As in all contract interpretation, the intention of the parties is paramount. Joseph Ryan, the Director of the Ocean Transportation Division of the Foreign Agricultural Service, United States Department of Agriculture, and the government's signatory to the Booking Confirmation did not regard the Booking Confirmation as the full and complete statement of the agreement between the parties. In his deposition, Mr. Ryan explained that the Booking Confirmation set forth the written requirements which his office wanted superimposed on the contract of carriage. He further explained that the bill of lading, not the Freight Engagement, constituted the contract of carriage. (J. Ryan Deposition, pp. 39–40)

Further evidence that the parties had intended to incorporate the bill of lading as part of their contract is found in the dock receipts which were received by John A. Merritt & Company, Central Gulf's agent, when the flour was unloaded in Pensacola and copies of which were mailed to the Department of Agriculture's Houston office (i.e., Overbey's office). Immediately above Merritt & Company's name as the receiving party appears the following printed notation:

"Received for shipment, transportation and delivery, subject to all terms and conditions of Carrier's current bill of lading: all conflicting or contrary terms or conditions herein contained being null and void."

These dock receipts, however, are labeled "Check Sheets/Pensacola Port Authority" and were presumably prepared by the Port Authority. Standing alone, these receipts would not establish the intention of Central Gulf and the government to incorporate the bill of lading. Taken in conjunction with the other indicia, however, the reference to it on the dock receipts does support the conclusion that the bill of lading was part of the contract between the parties.

In Berkshire Knitting Mills v. Moore-McCormack Lines, Inc., 265 F.Supp. 846 (S.D.N.Y.1965), the District Court held that language similar to that in the dock

receipts which were issued here was sufficient to incorporate the bill of lading. However, there, the shipper had agreed to sign the carrier's bill of lading but had not yet done so.[1]

Incorporation of the bill of lading is further established because the form of the bill of lading was known and "as a matter of common business experience in transactions of this nature both parties must be deemed bound" by the terms contained therein. *Berkshire Knitting, supra*, at 846.

In Luckenbach S. S. Co., Inc. v. American Mills, 24 F.2d 704 (5th Cir. 1928), the court went so far as to hold that liability was determined by the bill of lading even though there was no tacit incorporation of it in the memorandum acknowledging receipt, and it was not issued until after the loss occurred. There, 1,450 cots were destroyed by fire before they could be loaded onto the carrier's vessel, and the carrier argued that he was relieved of liability because his standard bill of lading exempted him from liability for loss caused by fire. The court explained:

"Appellant [carrier] was required by law to issue a bill of lading . . . . Appellee is presumed to know the law, and therefore must have known the terms and conditions on which its goods were received and would be transported would be contained in a bill of lading to be issued later. In the circumstances, it cannot be inferred that it was the intention of the parties to enter into a contract that would bind the carrier as insurer; but an implied understanding arose from common business experience that the carrier would issue such bill of lading as it was its custom to issue to shippers in the usual course of its business. The Caledonia (C.C.) 43

F. 681, 685; s.c. 157 U.S. 124, 139, 15 S.Ct. 537, 39 L.Ed. 644." (24 F.2d 704, 705)

Here, too, "an implied understanding arose from common business experience that the carrier would issue such bill of lading as it was its custom to issue to shippers in the usual course of its business." As was explained earlier, Joseph Ryan, who signed the Booking Confirmation for the government, regarded it as the contract of carriage.

■ In further keeping with the customs of the shipping industry, Central Gulf filed its bill of lading with the Federal Maritime Commission along with the rates it was charging. (See Trial Testimony, pp. 300–302; 318–324) Presumably these documents were filed pursuant to 46 U.S.C. § 817(b)(1) which specifies that "every common carrier by water in foreign commerce and every conference of such carriers shall file with the Commission and keep open to public inspection tariffs showing all the rates and charges of such carrier or conference of carriers . . . and shall include specimens of any bill of lading, contract of affreightment, or other document evidencing the transportation agreement." When a carrier files a tariff with the Federal Maritime Commission, the public at large, including the shipper, is placed on constructive notice of everything contained therein which is contemplated or required by the Shipping Act. Pacific S. S. Co. v. Cackette, 8 F.2d 259 (9th Cir. 1925); Port of Tacoma v. S. S. Duval, 364 F.2d 615 (9th Cir. 1966). Although neither case dealt with tariffs filed by foreign carriers by water pursuant to § 18 of the Shipping Act, 46 U.S.C. § 817, they did deal with analogous filings made pursuant to other sections of the Act.

---

1. The dock receipt in *Berkshire Knitting* included the following statement: "RECEIVED THE ABOVE DESCRIBED MERCHANDISE FOR SHIPMENT AS INDICATED HEREON, SUBJECT TO ALL TERMS, CONDITIONS AND EXCEPTIONS OF THE BILL OF LADING." At 847. For more specific language in dock receipts which was held to establish the incorporation of the bill of lading, see Aspen Pictures v. Oceanic Steamship Co., 148 Cal.App.2d 238, 306 P. 2d 933 (1957).

## B. Central Gulf's Custody of the Flour

If a loss occurs while the property is in the custody of a carrier by water, 49 U.S.C. § 20(11) dictates that "the liability of such carrier shall be determined by the bill of lading of the carrier by water and under the laws and regulations applicable to transportation by water . . . ." By its terms, ¶ 1 of the bill of lading involved here incorporates the Carriage of Goods by Sea Act (Cogsa), 46 U.S.C. § 1300 et seq., and provides that it shall govern "throughout the entire time that the goods are in the custody of the carrier . . . ." Thus, Cogsa would be applicable prior to loading as long as the carrier had custody of the cargo since it was expressly made so by the bill of lading. *See*, § 7 of Cogsa, 46 U.S.C. § 1307; Zifferer v. Atlantic Lines, Ltd., 278 F.Supp. 736 (D.P.R.1968); Gilmore and Black, § 3–25, p. 127.[2]

Here, the issue is whether Central Gulf had custody of the flour while it was in Pensacola even though the flour was stored in a Pensacola Port Authority warehouse, not one owned by Central Gulf. We feel that Central Gulf's custody is established by the manner in which the carrier, shipper and Port Authority handled each stage of the transaction. The Pensacola Port Authority's Rules and Regulations specify that the Port Authority will not accept responsibility for damages occasioned by a host of causes, including losses due to insects. (Hale Exhibit 1, p. 13) After the Minneapolis Office of the Department of Agriculture purchased the flour and obtained bills of lading from the rail carriers, the matter was referred to the Houston branch of the Agricultural Stabilization and Conservation Service's Bulk Grain Division which was headed by Felton O. Overbey. Overbey's office authorized the unloading of the rail cars by the Pensacola Port Authority and copies of this authorization were sent to the steamship company, the Port Authority and the rail carrier. Dock receipts for the unloading were signed by G. C. Richardson as the representative for John A. Merritt & Company, Central Gulf's Steamship agent in Pensacola. Both Mr. Richardson and Ernest Bray, an employee of the Port Authority inspected the flour when it was unloaded. Each of the forty-six dock receipts indicates that Merritt & Company was the consignee and the party who received the flour. (Overbey Exhibit 8) In *Luckenbach, supra,* a memorandum which was similar to the dock receipts here was sufficient acknowledgment of receipt to show that the goods had passed into the shipper's possession, and that its liability as a

---

**2.** If there were no provisions in the bill of lading which specifically made Cogsa applicable, the decision as to which party should bear the loss would fall within the purview of § 1 of the Harter Act, 46 U.S.C. § 190 et seq. Although Cogsa superseded the Harter Act from the time goods were loaded until they were discharged, it is still applicable prior to loading (as in the instant case) and subsequent to discharge. The Monte Iciar, 167 F.2d 334 (3rd Cir. 1948); Zifferer v. Atlantic Lines, Ltd., 278 F.Supp. 736 (D.P.R.1968); I Benedict on Admiralty, 6th Ed. § 95, p. 287. Benedict, however, states that the Harter Act does not apply to pre-loading situations if the voyage has not yet commenced. I Benedict on Admiralty, 6th Ed. § 195, p. 289. This statement, we feel, only encompasses the third section of the Act. 46 U.S.C. § 192. In fact, in The Newport, 7 F.2d 452 (9th Cir. 1925), which Benedict cites as the sole support for his conclusion as to the time when the Act is applicable, the court explains that "respondents' case is rested wholly on the third section of the Harter Act (27 Statutes, 445)." At 453. Since *The Newport* holds that the vessel owner is not entitled to the protection of § 3 of the Harter Act until the voyage begins and the vessel has been either shown to be seaworthy at that crucial time or it has been proven that due diligence was exerted to make her so, it does not have any bearing on § 1 of the Harter Act which does not deal with seaworthiness. *Compare*, Aspen Pictures v. Oceanic Steamship Co., 148 Cal.App.2d 238, 306 P.2d 933 (1957), which cited The Newport for the proposition that § 1 of the Harter Act only applied once the vessel "broke ground."

common carrier had begun. 24 F.2d 704, 705. Even though Merritt and Company employees did not have keys to the warehouse, they could obtain easy access to the facility. Furthermore, no representatives from Overbey's Houston office were present in Pensacola.

Although it is true that in Pensacola, unlike New Orleans, the Port Authority owns the warehouses, takes care of unloading, designates the storage area and maintains the warehouses, the Pensacola flour was technically in the custody of Central Gulf which was consignee of the shipment through its agent and which inspected the flour, also through its agent.

## II. BURDEN OF PROOF UNDER COGSA

■ Since Cogsa is applicable because of the provisions in the bill of lading, liability for the damage is coextensive with the dimensions of the Act. Central Gulf contends that the flour was delivered to Pensacola in an infested condition which constituted an inherent vice so as to relieve it of liability. Presumably, Central Gulf is seeking the freedom from liability which the Cogsa exceptions from liability for inherent vice would afford. 46 U.S.C. § 1304(2)(m). That section states:

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from

\* \* \* \* \* \*

(m) Wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods. . . ."

Apart from Cogsa, a similar exception exists at common law relieving a carrier from "a loss or damage which has resulted from an inherent quality or defect, of the thing carried. For example . . . in the case of perishable goods,

such as fruit and hides, he does not answer for their decay or deterioration" when these defects are not the result of causes introduced by the shipowner. Carver, I, Carriage by Sea, 12 Ed., 13–14.

The threshold question is which party bears the burden of proving that the damage resulted from the excepted cause of inherent vice or defect. Central Gulf, the carrier, argues that the burden rests upon the shipper to establish that the flour was delivered in good condition. Conversely, the government contends that the carrier bears the burden of proving that the flour was infested when it was received.

A difference of opinion on this point is understandable because there is no clear cut approach to the problem. There appears to be a general rule that the party claiming that a loss was due to an excepted cause must prove that he falls within that exception. Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 645 (1934); The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546 (1909).[3] In both cases, however, there are caveats to this general rule, and we feel that the instant case must be considered in light of these qualifications.

In *The Folmina*, it was held that the damage could not be said to arise from an excepted cause unless the carrier proved what caused the damage but the Court added that:

"Of course, where goods are delivered in damaged condition plainly caused by breakage, rust or decay, their condition brings them within an exception exempting them from that character of loss, as the very fact of the nature of the injury shows the damage to be *prima facie* within the exception, and hence the burden is upon the shipper to establish that the goods are removed from its operation be-

---

[3]. Neither case dealt with an interpretation of Cogsa, for *Schnell* dealt with an exception under the Harter Act, and *The Folmina* was concerned with the applicability of a specific provision of the bill of lading. However, the distribution of the burden of proof under Cogsa is analogous to that in both of these cases.

cause of the negligence of the carrier." At 362, 29 S.Ct. at 365.[4]

In *Schnell*, the Court shed further light on how to qualify the general rule that a carrier must prove the applicability of an excepted cause of damage.

"It is commonly said that when the carrier succeeds in establishing that the injury is from an excepted cause, the burden is then on the shipper to show that that cause would not have produced the injury but for the carrier's negligence in failing to guard against it. Such we may assume the rule to be, at least to the extent of requiring the shipper to give evidence of negligence where the carrier has sustained the burden of showing that the immediate cause of the loss or injury is an excepted peril." *Schnell*, 293 U.S. 296, 305, 55 S.Ct. 194, 196.

There, however, the Court was not concerned with the shifting of the burden of proof because the efficient cause of the decay of a cargo of Spanish onions was not shown by the carrier to be due to an excepted peril.

We interpret the dictum from *Schnell* and *The Folmina* to mean that if the carrier offers evidence which demonstrates the probability that damage was caused by an inherent defect, then it is incumbent upon the shipper to prove that the carrier was negligent before the carrier can be held liable. In reaching this conclusion we considered a line of predominantly Second Circuit cases holding that the "shippers had the burden of establishing that their merchandise was in actual good order and condition at the time of shipment. Clark v. Barnwell, 23 U.S. 272, 12 How. 272, 283, 284, 13 L. Ed. 985; Monnier v. United States (D. C.) 16 F. (2d) 812, affirmed 16 F.2d 815 (C.C.A.2); Pan-American Hide Co. v.

Nippon Yusen (The Toyohashi Maru) (D.C.) 13 F.(2d) 871; The Dondo (D. C.) 287 F. 239; The Columbo, 6 Fed. Cas. p. 178, No. 3,040." The Niel Maersk, 91 F.2d 932 (2d Cir), cert. den. 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937). *See also*, The Sao Paulo, 207 F. 51 (2d Cir. 1913); Commodity Service Corporation v. Hamburg American Line, 354 F.2d 234 (2d Cir. 1965); Hecht, Levis & Kahn, Inc. v. The S. S. President Buchanan, 236 F.2d 627 (2d Cir. 1956).

In *The Niel Maersk*, Judge Augustus Hand, writing the majority opinion for himself and Judge Learned Hand, found that the general rule from *Schnell* was inapplicable because there the merchandise was assumed to be in good order when it was shipped, and the exception claimed was for sea perils, not as in Niel Maersk and here, for an inherent vice. Judge Hand went so far as to conclude that in order to state a cause of action, the shipper had to sustain the initial burden of proving the condition of a shipment when it was made. Here, however, we are not entirely embracing the *Niel Maersk* line of cases. Although the shipper must prove that the loss resulted from the carrier's negligence, we do not feel that this burden devolves upon him until the carrier has proven that the loss resulted from an excepted cause.

Although we have not found a precise statement of this conclusion in the Fifth Circuit, we feel that it synthesizes several of the previously drawn conclusions. *See,* Horn v. Cia. de Navegacion Fruco, S.A., 5th Cir., 404 F.2d 422 (1968); Compagnie de Navigation, Etc. v. Mondial United Corp., 5th Cir., 316 F. 2d 163 (1963); U. S. v. Lykes Bros. Steamship Co., Memorandum Opinion, 339 F.Supp. 1223 (1971).

---

4. The court continued by explaining that "where showing an injury by sea water does not, in and of itself, operate to bring the damage within the exception against dangers and accidents of the sea, it follows that it is the duty of the carrier to sustain the burden of proof by showing a connection between damage by the sea water and the exception against sea perils." 212 U.S. 354, 362, 29 S.Ct. 363, 365. In *The Folmina* the carrier did not sustain his burden of proving that the damage arose from an excepted cause because he failed to show what caused the sea water to enter the hold and damage the cargo of rice.

In the *Lykes* case, the District Court for the Southern District of Texas followed the New York line of cases, especially M. W. Zack Metal Co. v. S/S Birmingham City, 311 F.2d 334 (2d Cir. 1962), cert. den., 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963), and held that the cargo owner had the burden of proving delivery in good condition and discharge in bad condition. Only then would the burden shift to the vessel to prove that the damage occurred through a cause excepted under Cogsa. The court further held that if the cargo owner fails to discharge its burden of proof, the carrier must prevail even if the cause of the damage remains dubious and the carrier has failed to prove himself free from fault. There, although a cargo of flour which the government was exporting was found to be infested, it was shipped overseas only to be rejected by government agents at the port of discharge.

In both *Compagnie de Navigation* and *Horn,* however, it is recognized that the carrier must prove that the loss resulted from a cause for which he is not statutorily liable even though the plaintiff bears the initial burden of going forward. In *Compagnie de Navigation* where the carrier offered no proof of his proper care and custody of the goods, the court opted for the policy that the carrier, must "explain what took place or suffer the consequences." 316 F.2d 163, 171.

> "Of course it was the Carrier's lawful right to put the libelant to its proof and for its defense stand upon the sufficiency of evidence of delivery of the cargo to the Carrier in good order and condition." 316 F.2d 163, 169.

Neither case clearly enunciates when the burden of going forward shifts from the shipper to the carrier, nor is either one clear on whether the burden shifts back to the shipper.

In the instant case, the carrier, Central Gulf, has established the following facts which make it more probable than not that the infestation was caused by an inherent defect or vice which was present in the flour at the time it was delivered to the carrier's custody:

1. The railcars which had arrived in Pensacola between June 27, 1964 and July 2, 1964 were unloaded between June 30, 1964 and July 9, 1964. Central Gulf's custody began as of the date the flour was unloaded.

2. When the railcars were unloaded, they were inspected and exceptions were noted on twenty receipts as to bag count, torn bags and wetness. The torn bags were "recoopered" (resewed) without loss of contents.

3. Although no exception was noted on the dock receipts as to infestation, a preliminary and cursory inspection of this type is not conclusive. The Sao Paulo, 207 F.2d 51, 60 (2d Cir. 1913). Similarly, bills of lading have been held to be "evidence only of apparent or external good condition." Hecht, Levis & Kahn, Inc. v. The S. S. President Buchanan, 236 F.2d 627, 631 (2d Cir. 1956). *See also,* The Niel Maersk, 91 F.2d 932 (2d Cir.1937); Commodity Service Corporation v. Hamburg American Line, 354 F.2d 234 (2d Cir. 1965).

4. In conformity with normal prelifting procedure, the flour was inspected by Carlton Woody of Plant Quarantine on August 11, 1964 in order to decide whether a Phytosanitary Certificate could be issued. At that time Woody discovered substantial evidence of live infestation. Large numbers of larvae and adult insects were found. Woody reported that there were as many as fifty or sixty insects per bag in his examination of about one-fourth of the total shipment. Subsequently, Overbey inspected almost all of the flour and reported that he saw as many as fifteen or twenty insects per square foot. (Trial Testimony, p. 37) Thus, there was a heavy, uniform infestation with insects in various stages of growth.

5. Analysis of flour samples in Mobile by John Litton, an insect taxonomist with the Department of Agriculture, revealed that six species of insects

were present: *Lasioderma serricorne* (cigarette beetle), *Carpophilius diamiatus* (corn sap beetle), *Typhaea stercorea* (hairy fungus beetle), *Trogoderma glabrum* (no common name given), *Triboleum castaneum* (red flour beetle), *Oryaephilus surinamensis* (saw toothed grain beetle).

6. The life cycle from egg to adult of these six insects is about thirty days but a life cycle of up to six weeks would not be unusual for most of them. The life span, i.e., the time from birth until death, of these six ranges from a month to several years.

7. Since Central Gulf's custody began as early as June 30, 1964 and as late as July 9, 1964, when the flour was unloaded and since the official discovery of the infestation was August 11, 1964, the flour was in Central Gulf's possession for at most forty-two days before the infestation was discovered, and some was only in its possession for thirty-one days. Woody even testified that he observed the infestation several days before August 11, 1964 but felt that it was not his job to say anything. (Woody Dep. 20–21). Central Gulf claims that Woody observed the infestation ten days before the official August 11 discovery or when some flour had been unloaded for thirty-two days and some for twenty-one days.

8. Therefore, there was insufficient time for the heavy, uniform infestation to develop within the length of time the flour was in Central Gulf's custody in Pensacola.

9. Dr. Hobart P. Boles, who was an entomologist with a research division of the Department of Agriculture and the government's only expert witness, repeatedly testified that it was impossible for him to state when the flour became infested. (Trial Testimony, pp. 140, 155, 156)

10. We agree with Central Gulf's expert, Mr. O'Dean Kurtz, that the infestation did not come from the warehouse because of the extent and thoroughness of the infestation. Although Mr. Kurtz

hypothesized that the infestation could have originated in the boxcars or the mill, the evidence did not establish precisely where the infestation began.

11. Furthermore, both Mr. Litton, the Department of Agriculture taxonomist, and Edward Nickinson, Jr., an employee of Merritt & Company, agreed that the presence of small piles on the exterior of the flour bags indicated that the insects had been inside the bags and had come out. (Trial Testimony, p. 259; Litton Dep., pp. 23–24)

■■ Given these facts, which establish that the flour was in all probability infested when it was received by Central Gulf, it was incumbent upon the government to prove that the carrier was negligent in some way if it was to avoid liability. This, the government has failed to do. Overbey, the head of the Houston Branch of the Agriculture Stabilization and Conservation Office, described the warehouse as a good one (Trial Testimony, p. 37). It was new, with a concrete floor, approximately a five-foot rise of concrete around the perimeter, corrugated metal above the concrete, and plastic skylights. The flour was stacked on pallets with roughly thirty to thirty-six bags per pallet.

Although the government tried to establish a causal connection between the infestation in the flour and the infested tapioca which was stored nearby, they failed to do so. In fact the evidence demonstrated that the insects must have come from inside of the bags of flour which would negate the possibility that the flour was contaminated by an outside source such as the tapioca.

The government also alleged that Central Gulf did not take as many precautions as it should have taken because it failed to conduct inspections while the flour was in its custody. Although Boles testified that an examination of the flour on at least a weekly basis was necessary to provide for an early discovery of any infestation, he was unable to say when the instant infestation began or if regular inspections would have pre-

vented its spread. If early discovery of the infestation is the key to the government's case, they should bear the loss since Woody, one of their agents, observed the infestation several days before he did anything about it.

Central Gulf similarly charges the government with failing to do all that it could have done to safeguard the flour prior to its delivery. Although the government details a long series of fumigations and precautions at the mill and while the flour was en route to Pensacola, the carrier argues that the government should have done such things as ship the flour in airtight boxcars, package it in bags of different material or perform a microscopic analyzation in order to ascertain whether any insect eggs passed through the sifters. Assuming both parties could have been more careful, we are unable to say that any of these omissions by either side caused the infestation.

### III. CENTRAL GULF'S DELAY IN PROVIDING A VESSEL DID NOT BREACH THE CONTRACT

 The Booking Confirmation lists July 21, 1964 as the loading and foreign sailing date but no vessel called for the flour until August 10, 1964. Thus, there was a twenty-day delay which the government claims breached the contract between the parties.

 Central Gulf advised the government that the lifting date would be postponed and offered to substitute a foreign flag vessel. Joseph Ryan, the Chief of the Ocean Transportation Branch of the United States Department of Agriculture's Foreign Agricultural Service, who would have had to approve the substitution of another ship, refused to do so because of statutory requirements that fifty per cent of government-owned cargo be shipped on American vessels. By refusing a proferred substitution, we believe the government condoned the delay. If the government had so desired, it could have put Central

Gulf in breach as soon as it received notice of the delay.

The contract could have been terminated when the government was apprised of the delay, but it was not. Ryan explained that cancellation is resorted to only if the cargo is urgently needed overseas and the carrier cannot find a substitute vessel, (J. Ryan Dep., pp. 40–41). The Booking Confirmation, which formed part of the contract between the parties, read "Vessel: SS 'GREEN VALLEY' or Sub." Presumably, the possibility of shipping on an alternate vessel was not alien to the minds of the parties at the time the contract was formed.

 Furthermore, a contract is not automatically breached when one party fails to perform at a specified time, even in the absence of a proferred substitution. As Corbin explains:

> "[C]ustom may allow days of grace for certain purposes; and we must always be on the lookout for good legal excuses that prevent nonperformance from being a breach of duty." Corbin on Contracts, § 713, p. 353.

Here, we have an example of the "good legal excuse" of impossibility. In early July the military branch of the government requested that Central Gulf allow the SS GREEN VALLEY to be used for transporting a priority military cargo from Turkey to the Azores. This contributed to about ten or fifteen days of the vessel's delay in reaching Pensacola. Also, in ocean transportation it is customary for lifting dates to be delayed several days beyond the date specified in the contract. Overbey testified that delays of sixteen or seventeen days in the foreign sailing dates for foodstuffs would not surprise him, (Trial Testimony, p. 64). Ryan intimated that his office frequently either allowed delays or made alternative arrangements if urgent delivery was required, (J. Ryan Dep., p. 28). Harold Grehan, Senior Vice-President for Central Gulf, testified that out of eleven Central Gulf vessels which carried government give-away flour (Public

Law 480, type II cargo) from March through December, 1964, the actual lifting date was from two days before to fifty days after the anticipated lifting date, (Trial Testimony, p. 328).

There is also the provision in the bill of lading which says that nothing in the document is to be "read as an engagement that the said carriage shall be performed directly or without delays." Although Cogsa, 46 U.S.C. § 1303(8) prevents this clause from relieving the carrier of delays caused by its own negligence, it would at least serve to remind the shipper of the possibility of delay.

Furthermore, the government has failed to show any causation between the delay and the infestation. Since Dr. Boles, the government's own witness, could not even say when the infestation occurred, we find nothing to indicate that the cargo would not have become infested if it were lifted on schedule.[5]

## IV. CONCLUSION

In conclusion, we have found that Central Gulf's standard bill of lading forms part of the contract between the carrier and the shipper and that this bill of lading incorporates the provisions of the Carriage of Goods by Sea Act, when, as here, the carrier has custody of the shipment. The carrier has sustained the burden of placing himself within the Cogsa exception from liability for inherent vice, and the government has been unable to prove any negligence on the part of Central Gulf in caring for the flour. Despite the disparity between the scheduled and actual lift-off dates, the delay did not breach the contract of carriage, and it was not proven to have caused the infestation.

Accordingly, it is the order of the court that judgment be entered herein in favor of the defendants, Central Gulf Steamship Corporation and Robert Wall,

Inc., in these two consolidated matters and that they be relieved of any and all liability therein. Defendants will submit appropriate judgments in accordance with this memorandum opinion.

---

5. *Compare*, Schroeder Bros. Inc. v. The Saturnia, 226 F.2d 147, 149 (2d Cir. 1955), which required the party seeking to be exonerated under 46 U.S.C. § 1304(2)(j), which relieves a carrier from liability occasioned by strikes, to show that there was a causal connection between the strike with its resultant delay and the moldy chestnuts.