ROBERT L. BERNER CO., Plaintiff,

v.

OLVIND LORENTZEN BJORNBO, a corporation, Nopal Lines, a corporation, in personam, and the SS NOPAL REX, etc., Defendants.

Civ. A. No. 7172–72–P.

United States District Court,
S. D. Alabama, S. D.

Jan. 31, 1974.

**1178**

A. Clay Rankin, III, of Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., for plaintiff.

T. E. Twitty and George McKean, of Inge, Twitty, Duffy & Prince, Mobile, Ala., for defendants.

### FINDINGS OF FACT and CONCLUSIONS OF LAW

WILLIAM D. MURRAY, Senior District Judge.

The plaintiff Robert L. Berner Co., Inc. (hereinafter "Berner"), brought this cargo damage claim against Olvind Lorentzen Bjornbo, a corporation, Nopal Lines, a corporation, *in personam*, and the SS NOPAL REX, her engines, hull, tackle, etc., *in rem*, alleging serious cargo damage to a shipment of 2,000 bags of brazil nuts from Santos, Brazil, to Mobile, Alabama. After hearing the trial on the merits, and considering the testimony and the exhibits offered, this court enters the following Findings of Fact and Conclusions of Law:

1. At all material times Berner was, and still is, a corporation organized and existing under the laws of the State of Illinois.

2. At all material times defendants were corporations organized under the laws of a foreign State, and were owners and operators of the SS NOPAL REX. The defendants at all material times operated the vessel as a common carrier by water for hire.

3. On or about June 25, 1970, there was delivered to the SS NOPAL REX at Santos, Brazil, 3000 bags of brazil nuts, to be carried to Mobile, Alabama, in consideration for an agreed freight which has been paid.

4. This cargo was purchased by the plaintiff under a written contract between plaintiff and Bolbras S. A. dated January 15, 1970, whereby plaintiff agreed to buy and Bolbras agreed to sell one hundred metric tons (220,000 pounds) of brazil nuts in the shell, 57/62 count per pound, guaranteed to crack ninety-three percent on arrival, moisture not to exceed 11% on arrival, guaranteed to pass Food and Drug requirements on arrival, at the price of fifteen cents a pound, F. O. B. Santos, Brazil, net weights on arrival to govern, in new jute bags of 50 kilos net each on arrival (50 kilos said to equal 110.23 pounds). The contract provided that in the event the nuts are less than ninety percent sound on arrival, the buyer has the option of total rejection, unless a satisfactory settlement can be arranged.

5. The long form bill of lading provided that the nuts could be transported in ordinary cargo compartments without any special care or facilities.

6. The test of the nuts conducted five days prior to loading by Sociedade Brasileria de Superinendencia Ltda. show that, after being put through a dryer, the nuts had a moisture content of between 12 and 13%.

7. The nuts were loaded aboard the vessel on or about June 25, 1970. It rained for about an hour during the loading operation.

8. Other than the nuts, no other cargo in Lower Hold No. 1 was found to be wet upon arrival in Mobile.

9. Tests conducted subsequent to arrival in Mobile show that there was no presence of salt water on the nuts tested.

### CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter pursuant to 28 U.S.C., Section 1333, and over all the parties here involved, with the exception of the SS NOPAL REX, which has not been seized.

2. The plaintiff, Robert L. Berner Co., failed to prove by a preponderance

of the evidence that the nuts were delivered for shipment in "good condition". The plaintiff has thus failed to establish a prima facie case under the Carriage of Goods by Sea Act, 46 U.S.C. Section 1301 et seq. *Horn v. Cia de Navegacion Fruco, S.A.*, 404 F.2d 422, 435 (5th Cir. 1968), *cert. den.* 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1968).

## MEMORANDUM

This case involves a shipment of brazil nuts from Santos, Brazil, to Mobile, Alabama. The shipper, Robert L. Berner Co., claims that the nuts were delivered to the Nopal Lines, the carrier, in good condition at Santos on June 25, 1970, and were received in damaged condition in Mobile July 11, 1970. The plaintiff-shipper thus claims that he has established a prima facie case under the Carriage of Goods by Sea Act, 46 U.S.C. § 1301 et seq. See *Horn v. Cia de Navegacion Fruco, S.A.*, 404 F.2d 422, 435 (5th Cir. 1968), *cert. den.* 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed. 477 (1968), in which the Fifth Circuit stated:

> "Once it has been established that the bananas were loaded in good condition and unloaded in damaged condition, the carrier can avoid liability only by proving that the damage resulted from a cause for which it is statutorily not responsible, or that it exercised due diligence to prevent the harm."

The initial question the court must resolve is whether or not the plaintiff has shown that the nuts were delivered for transport in "good condition". In determining what constitutes "good condition", the term must be put in the context of the bill of lading. (Plaintiff's exhibit #3), Paragraph 10 of the long form Bill of Lading reads as follows:

> "10. PERISHABLE GOODS—Fruit, vegetables, meat and any goods of a perishable nature when accepted may be carried in ordinary cargo compartments or on deck without special facilities or attention, unless the carrier has made . . . a written agree-

ment that such goods will be carried in a . . . specially equipped compartment.

> "Unless a special agreement is made and inserted in this bill of lading, the carrier does not undertake and shall not be liable for failure to give the goods . . . any unusual or special care . . . or facilities . . . and the shipper represents and warrants the goods do not require such care or facilities."

Since there was no special agreement as to any unusual care required, the plaintiff agreed that the nuts could be carried in ordinary cargo compartments. In order to prevail, plaintiff must show that the nuts were delivered in such a condition as to withstand a sea voyage in a humid climate with no special ventilation or care.

In attempting to show that the nuts were delivered to the carrier in good condition, the plaintiff relies upon four things:

1. Clean bills of lading,
2. Clean mate's receipts,
3. A crack test performed by the seller of the nuts, Bolbras, S.A.,
4. The test performed by Sociedade Brasileria de Superinendencia Ltda.

The bills of lading and the mate's receipts are results of preliminary and cursory inspections and are not conclusive. They are evidence only of apparent or external good condition. See *United States v. Central Gulf Steamship Corp.*, 340 F.Supp. 473 (E.D. La.1972); *Hecht, Levis & Kahn, Inc. v. The S. S. President Buchanan*, 236 F.2d 627, 631 (2nd Cir. 1956). As to the crack test performed by Bolbras, the results of that test are contained in a letter from Mr. Yokana, the President of Bolbras, to the plaintiff Berner dated June 29, 1970—four days after the nuts were shipped. (See plaintiff's exhibit #4). The letter states that the percentage of defective nuts ranged between

one and three percent but makes no mention of moisture content. Mr. Yokana stated in his deposition that at the time of the test, he found no evidence of excessive moisture content. (See Yokana deposition page 3). On June 20, 1970, five days prior to shipment, four samples were drawn and certified by Sociedade Brasileria de Superinendencia Ltda. (See Exhibit B to Yokana deposition). Each of these four samples showed a moisture content of between 12 and 13 percent. The contract between the parties specified that "moisture not to exceed eleven percent on arrival . . . ." Although it is not known what Mr. Yokana meant by "excessive" moisture content, these tests did show that the nuts exceeded contract specifications even after they had been put through a dryer in Sao Paulo.

■ Experts from both sides (Dr. Amling and Mr. John Farrell) testified as to the propensity of brazil nuts to absorb moisture. In light of this testimony and the fact that the nuts were being transported over water in a humid climate, the moisture content of the nuts should have at least met the contract specifications (11%) on departure from Brazil. Even then, the nuts would not have been able to absorb any moisture en route and yet have met the contract requirements on arrival in Mobile. The evidence does not warrant a finding that the nuts were in "good condition" when they were delivered to the defendant carrier for transport.

■ Even assuming that the nuts were delivered to the carrier in good condition, plaintiff has failed to show that the damage was the result of some negligence on the part of the defendant. This burden devolved upon the plaintiff upon the defendant's showing that the damage, in all probability, resulted from inherent vice. 46 U.S.C. § 1304(2)(m); *United States v. Central Gulf, supra* 340 F.Supp. at 481. In the Central Gulf case, a Louisiana District Court stated the apparent general rule that the party

claiming that a loss was due to an excepted cause must prove that he falls within that exception. The court cited *Schnell v. The Vallescura*, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934), and *The Folmina*, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546 (1909), and stated:

> "We interpret the dictum from Schnell and The Folmina to mean that if the carrier offers evidence which demonstrates the probability that damage was caused by an inherent defect, then it is incumbent upon the shipper to prove that the carrier was negligent before the carrier can be held liable. In reaching this conclusion we considered a line of predominantly Second Circuit cases holding that the 'shippers had the burden of establishing that their merchandise was in actual good order and condition at the time of shipment'. Cases cited including *The S. S. Buchanan, supra* [236 F.2d 627 (2d Cir. 1956)].

. . . . . .

> "Although the shipper must prove that the loss resulted from the carrier's negligence, we do not feel that this burden devolves upon him until the carrier has proven that the loss resulted from an excepted cause."

In discussing the carrier's burden of proving an excepted cause, the court went on to state:

> "In the instant case, the carrier, Central Gulf, has established the following facts which make it more probable than not that the infestation was caused by an inherent defect or vice which was present in the flour at the time it was delivered to the carrier's custody: . . . Given these facts, which establish that the flour was in all probability infested when it was received by Central Gulf, *it was incumbent upon the government to prove that the carrier was negligent in some way if it was to avoid liability*." (Emphasis added).

The following evidence preponderates in favor of the carrier's defense of in-

herent vice, defect or quality: (1) Experts from both sides (Dr. Amling and Mr. John Farrell) testified as to the propensity of brazil nuts to absorb moisture. Dr. Amling further testified as to the inherent nature of mold in brazil nuts. (2) The tests conducted by Sociedade Brasileria de Superinendencia Ltda. show that even after the nuts had been put through a dryer they exceeded the contract specifications as to moisture content. (3) The First Officer of the NOPEL REX, Gord Gyland, testified in his deposition (pp. 18–19) that on the day the nuts were loaded aboard ship, June 24, 1970, work was stopped for an hour due to rain. (See the ship log of the NOPEL REX, defendant's exhibit #2). (4) In a test of the nuts [1] run by the O'Connor-Valls Laboratory in September of 1970, subsequent to the arrival of the nuts in Mobile in July of 1970, it was found that there was no presence of salt water on any of the samples tested. (5) First Officer Gyland stated in his deposition (p. 33) that no other cargo in Lower Hold No. 1, where the nuts were carried, was found to be wet.

Plaintiff has proffered no evidence tending to show negligence by the defendant carrier during the transporting of the nuts on the Nopal Rex. Plaintiff is relying completely upon his having established a prima facie case which he has failed to do since he has not shown that the nuts were delivered to the carrier in "good condition".

The defendant shall submit a form of judgment; each side to bear its own costs.

---

[1]. See page 16 of deposition of Frank W. Valls. A test was also conducted by Vester J. Thompson, Jr., Inc. in July of 1970. The Thompson test, however, was based on storage *bags* rather than on the *nuts* themselves and the conclusions of the Thompson test are equivocal at best.

"In that the sample of coffee sacks submitted by Mr. Farrell contain significant quantities of elements normally present in sea water, we are unable to state definitely that sea water had been in contact with the samples. However, the relatively higher percentage of Chloride, sodium, and potassium in the samples from sacks with brown stains, the sacks that appeared to have been wet, and the sacks that appeared to be undamaged indicates that sea water had been in contact with these samples." (See Defendant's Exhibit # 26).